# EXHIBIT 1



## Service of Process Transmittal Summary

**TO:**    Al Slepian, Assistant Director
Synagro Technologies, Inc.
435 Williams Ct Ste 100
Baltimore, MD 21220-2881

**RE:**    **Process Served in Texas**

**FOR:**    Synagro of Texas - CDR, Inc.  (Domestic State: TX)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | Re: JAMES FARMER, ROBIN ALESSI, PATSY SCHULTZ, KAREN COLEMAN, TONY COLEMAN, ALTON MORTON BRYANT, AND CHRISTOPHER MICHAEL BRYANT // To: Synagro of Texas - CDR, Inc. |
| **CASE #:** | DCC202400917 |
| **NATURE OF ACTION:** | Product Liability Litigation - Personal Injury |
| **PROCESS SERVED ON:** | C T Corporation System, Dallas, TX |
| **DATE/METHOD OF SERVICE:** | By Process Server on 11/19/2024 at 12:17 |
| **JURISDICTION SERVED:** | Texas |
| **ACTION ITEMS:** | CT will retain the current log |
| | Image SOP |
| | Email Notification,  Al Slepian  aslepian@synagro.com |
| **REGISTERED AGENT CONTACT:** | C T Corporation System |
| | 1999 Bryan Street |
| | Suite 900 |
| | Dallas, TX 75201 |
| | 866-401-8252 |
| | LargeCorporationTeam@wolterskluwer.com |

The information contained in this Transmittal is provided by CT for quick reference only. It does not constitute a legal opinion, and should not otherwise be relied on, as to the nature of action, the amount of damages, the answer date, or any other information contained in the included documents. The recipient(s) of this form is responsible for reviewing and interpreting the included documents and taking appropriate action, including consulting with its legal and other advisors as necessary. CT disclaims all liability for the information contained in this form, including for any omissions or inaccuracies that may be contained therein.



## PROCESS SERVER DELIVERY DETAILS

**Date:**                    Tue, Nov 19, 2024
**Server Name:**             Kenneth Frechette

| Entity Served | SYNAGRO OF TEXAS-CDR, INC. |
|---|---|
| Case Number | DC-C202400917 |
| Jurisdiction | TX |

| Inserts | | |
|---|---|---|
| | | |



# S t a t e   o f   T e x a s

249TH DISTRICT COURT                                              JOHNSON COUNTY, TEXAS

DISTRICT CLERK                                                ATTORNEY FOR PLAINTIFF(S)

DAVID R. LLOYD                                                **MARY WHITTLE**
GUINN JUSTICE CENTER                                          **510 BAYLOR STREET**
P.O. BOX 495                                                  **AUSTIN TX 78703**
CLEBURNE, TEXAS 76033

```
================================================================================
                   C I T A T I O N   –   C I V I L
================================================================================
```
### (PLAINTIFF'S ORIGINAL PETITION)
CAUSE NO. **DC-C202400917**

NOTICE TO DEFENDANT:

YOU HAVE BEEN SUED. YOU MAY EMPLOY AN ATTORNEY. IF YOU OR YOUR ATTORNEY DO NOT FILE A WRITTEN ANSWER WITH THE CLERK WHO ISSUED THIS CITATION BY 10:00 A.M. ON THE MONDAY NEXT FOLLOWING THE EXPIRATION OF TWENTY DAYS AFTER YOU WERE SERVED THIS CITATION AND PETITION, A DEFAULT JUDGMENT MAY BE TAKEN AGAINST YOU. IN ADDITION TO FILING A WRITTEN ANSWER WITH THE CLERK, YOU MAY BE REQUIRED TO MAKE INITIAL DISCLOSURES TO THE OTHER PARTIES OF THIS SUIT. THESE DISCLOSURES GENERALLY MUST BE MADE NO LATER THAN 30 DAYS AFTER YOU FILE YOUR ANSWER WITH THE CLERK. FIND OUT MORE AT TEXASLAWHELP.ORG.

TO:   **SYNAGRO OF TEXAS-CDR, INC.**
      **CT CORPORATION SYSTEM**
      **1999 BRYAN ST STE 900**
      **DALLAS TX 75201**


DEFENDANT - GREETINGS:

You are hereby commanded to appear by filing a written answer to the plaintiff's
                          **O R I G I N A L**
petition by 10:00 a.m. of the Monday next following the expiration of twenty (20) days after the service date of this citation and petition before the Honorable **249TH DISTRICT COURT** of Johnson County, Cleburne, Texas.

Said                      **O R I G I N A L**                              petition was filed in said court on the **15TH DAY OF NOVEMBER, 2024**, in this cause numbered **DC-C202400917**, on the docket of said court, and styled:

**JAMES FARMER, ROBIN ALESSI,PATSY SCHULTZ,KAREN COLEMAN,TONY COLEMAN,ALTON BRYANT,CHRISTOPHER BRYANT**
     **VS. SYNAGRO TECHNOLOGIES, INC.,SYNAGRO OF TEXAS-CDR, INC.,RENDA ENVIRONMENTAL, INC.**

The nature of this demand is fully shown by a true and correct copy of the petition accompanying this citation and made a part hereof.

The officer executing this writ shall promptly serve the same according to the requirements of law, and mandates thereof, and make due return as the law directs.

Issued and given under my hand and seal of said Court at office in Cleburne, Texas, this **18TH DAY OF NOVEMBER, 2024**.

                              DAVID R. LLOYD - DISTRICT CLERK
                              249TH DISTRICT COURT
                              JOHNSON COUNTY, TEXAS

                        BY  *Shanda Loven*                          DEPUTY

**OFFICER'S / AUTHORIZED PERSON'S RETURN**

CAUSE NO. **DC-C202400917**

Came to hand the _____ day of _____, _____, at _____ o'clock ___.m., and executed in _____ County, Texas, on the _____ day of _____, _____, at _____ o'clock ___.m., by delivering to the within-named _____, in person, a true copy of this citation, with an accompanying copy of the petition, having first attached such copy of petition to such copy of citation and endorsed on such copy of citation the date of delivery.

FEES:

Serving Writ: $_____          _____

                                   Sher./Const./Auth. Person

                                   _____

                                                            County, Texas

                                   By _____ Deputy

SUBSCRIBED AND SWORN TO by _____, before me, the undersigned authority, this _____ day of _____, _____.

_____          _____

Notary Public (State of Texas)                Notary Public (Printed Name)

         Commission Expiration:    _____

Filed: 11/15/2024 5:01 PM
David R. Lloyd, District Clerk
Johnson County, Texas
By: Shanda Lovell, Deputy

CAUSE NO. DC-C202400917
_____

| | | |
|---|---|---|
| **JAMES FARMER, ROBIN ALESSI,** | § | **IN THE DISTRICT COURT OF** |
| **PATSY SCHULTZ, KAREN COLEMAN,** | § | |
| **TONY COLEMAN, ALTON MORTON** | § | |
| **BRYANT, AND CHRISTOPHER** | § | |
| **MICHAEL BRYANT,** | § | Johnson County - 249th District Court |
| **Plaintiffs,** | § | |
| | § | |
| | § | **JOHNSON COUNTY, TEXAS** |
| **v.** | § | |
| | § | |
| **SYNAGRO TECHNOLOGIES, INC.,** | § | |
| **SYNAGRO OF TEXAS—CDR, INC.,** | § | |
| **AND RENDA ENVIRONMENTAL,** | § | |
| **INC,** | § | **\_\_\_\_\_ JUDICIAL DISTRICT** |
| **Defendants.** | § | |

## ORIGINAL PETITION AND APPLICATION FOR MANDATORY INJUNCTION

TO THE HONORABLE JUDGE OF THIS COURT:

COME NOW James Farmer, Robin Alessi, Patsy Schultz, Karen Coleman, Tony Coleman, Alton Morton Bryant, and Christopher Michael Bryant, Plaintiffs, complaining of Synagro Technologies, Inc., Synagro of Texas—CDR, Inc., (collectively "Synagro") and Renda Environmental, Inc. ("Renda") and would show the following:

### I.  Nature of Claims

1.      Plaintiffs' farms were poisoned by toxic chemicals in a biosolids-based fertilizer produced and marketed by Synagro when a neighboring farmer spread it on his crops.

2.      Synagro contracts with more than a thousand municipal wastewater facilities across North America, including the City of Fort Worth, Texas.

3.      Synagro uses the biosolids from those wastewater facilities, also known as "sewage sludge," to make Synagro Granulite Fertilizer. During the wastewater treatment process, liquids are separated from solids, and the solids are treated to remove some toxic ingredients and reduce

pathogens. However, even after treatment, biosolids typically contain a variety of persistent pollutants.

4.    Prior to Synagro's contract with the City of Fort Worth, Texas, Renda Environmental previously contracted with the city to manage the biosolids from its wastewater facilities. Based on information and belief, Renda Environmental also produced and marketed a biosolids-based fertilizer that was applied by the same neighboring farmer to his land.

5.    Per- and polyfluoroalkl substances, or "PFAS," are a large family of human-made chemicals that provide heat, stain, and water resistance, making them useful for a range of commercial and industrial applications. All PFAS chemicals contain multiple bonds between atoms of carbon and fluorine, which are extremely strong and give PFAS their exceptional chemical and thermal stability. Due to these strong bonds, PFAS (or in some cases, their degradation products) are highly persistent in the environment and are called "forever chemicals."

6.    Human exposure to PFAS is associated with cancer, birth defects, developmental damage to infants, and impaired functioning of the liver, kidneys, and immune system. PFAS are also toxic to animals.

7.    Because PFAS are not removed by conventional wastewater treatment, they accumulate in the biosolids that Synagro uses (and Renda used) to make its fertilizer, which Synagro falsely markets as being safe and organic.

8.    Since they were exposed to PFAS and other toxic chemicals through Synagro Granulite Fertilizer and/or Renda's biosolids fertilizer, Plaintiffs have suffered significant health consequences. In addition, the exposure has caused devastating damage to their livestock and rendered the land where they live and work nearly worthless.

9.      Plaintiffs were unaware that the injuries described herein were attributable to the fertilizers that were applied to their neighbor's land and apparently migrated to Plaintiffs' lands until Johnson County tested Plaintiffs' properties, their livestock, and the Synagro Granulite Fertilizer for PFAS and other toxic chemicals as part of a criminal investigation.

10.     Plaintiffs do not seek by this action to restrain any agricultural operation, and neither the claims nor the relief sought runs afoul of the provisions of the Texas Right to Farm Act. Rather than restrain Defendants from continuing to operate, this action seeks a mandatory injunction requiring Defendants to clean up and restore Plaintiffs' properties from harm caused by a defective product that migrated to their lands.[1]

## II. Discovery Control Plan

11.     Plaintiffs intend to conduct discovery under Level 3 of TEX. R. CIV. P. 190.3 and affirmatively plead that this suit is not governed by the expedited-actions process in TEX. R. CIV. P. 169 because Plaintiffs seek monetary relief in excess of $250,000.

## III. Relief Sought

12.     The extent of the damage to Plaintiffs' property has not been fully characterized as of the date of the filing of the petition. Plaintiffs seek non-monetary relief and monetary relief over $1,000,000. TEX. R. CIV. P. 47(c)(5). The damages sought herein are within the jurisdictional limits of this Court.

## IV.  Parties

13.     Plaintiff James Farmer resides at 12125 County Road 102, Grandview, Texas 76050, which has been impacted by the land application of Defendants' biosolids fertilizer. He is

---

[1] In any event, there is no reason to believe any of the Defendants (or their activities at issue in this suit) comprise an "agricultural operation," as that term is defined in the Texas Right-to-Farm Act. *See* TEX. AGRI. CODE ANN. § 251.001, *et seq.*

Plaintiff Robin Alessi's partner and has resided at and taken care of the property since December 2013. The last three digits of Mr. Farmer's Texas driver's license number are 730. The last three digits of his Social Security number are 002.

14.     Plaintiff Robin Alessi owns the property at 12125 County Road 102, Grandview, Texas 76050, which has been impacted by the land application of Defendants' biosolids fertilizer. She purchased the property in 2010 and has resided there since that time. The last three digits of Ms. Alessi's Texas driver's license number are 675. The last three digits of her Social Security number are 319.

15.     Plaintiff Patsy Schultz resides at 12201 County Road 102, Grandview, Texas 76050, which has been impacted by the land application of Defendants' biosolids fertilizer. She and her husband, James Schultz, purchased the property in 2002, and she inherited his share after his passing in 2018. The last three digits of Ms. Schultz's Texas driver's license number are 961. The last three digits of her Social Security number are 416.

16.     Plaintiff Karen Coleman resides at 4145 Burleson Retta Road, Burleson, Texas 76028. Mrs. Coleman is Patsy Schultz's daughter and leases for cattle grazing her mother's property at 12201County Road 102, Grandview, Texas 76050, which has been impacted by the land application of Defendants' biosolids fertilizer. The last three digits of Ms. Coleman's Texas driver's license number are 154. The last three digits of her Social Security number are 792.

17.     Plaintiff Tony Coleman resides at 4145 Burleson Retta Road, Burleson, Texas 76028. He is Patsy Schultz's son-in-law and leases for cattle grazing the property at 12201 County Road 102, Grandview, Texas 76050, which has been impacted by the land application of Defendants' biosolids fertilizer. The last three digits of Mr. Coleman's Texas driver's license number are 216. The last three digits of his Social Security number are 713.

18.     Plaintiff Alton Morton Bryant resides at 12804 County Road 102, Grandview, Texas 76050. Mr. Bryant owns this property, which has been impacted by the land application of Defendants' biosolids fertilizer. The last three digits of Mr. Bryant's Texas driver's license are 112. The last three digits of his Social Security number are 536.

19.     Plaintiff Christopher Michael Bryant resides at 12800 County Road 102, Grandview, Texas 76050. Mr. Bryant lives on this property, which has been impacted by the land application of Defendants' biosolids fertilizer. The last three digits of Mr. Bryant's Texas driver's license are 002. The last three digits of his Social Security number are 044.

20.     Defendant Synagro Technologies, Inc. is a Delaware corporation, with a principal office located at 435 Williams Court, Ste. 100, Baltimore, Maryland 21220. It may be served with process by serving its Registered Agent in Texas: CT Corporation System, 1999 Bryan St., Ste. 900, Dallas, Texas 75201.

21.     Defendant Synagro of Texas—CDR, Inc. is a Texas corporation, with a principal office located at 435 Williams Court, Ste. 100, Baltimore, Maryland 21220. It may be served with process by serving its Registered Agent: CT Corporation System, 1999 Bryan St., Ste. 900, Dallas, Texas 75201.

22.     Defendant Renda Environmental, Inc. is a Texas corporation, with a principal office located at 522 Benson Lane, Roanoke, Texas 76262. It may be served with process by serving its Registered Agent: Oscar Renda, 522 Benson Lane, Roanoke, Texas 76262, or wherever he may be found.

### V.  Jurisdiction and Venue

23.     The Court has jurisdiction over the lawsuit because the controversy exceeds this Court's minimum jurisdictional requirements.

24.    Texas venue is mandatory in Johnson County under TEX. CIV. PRAC. & REM. CODE §15.011 because this suit is, in part, for damages to real property, and Johnson County is where the property at issue is located.

25.    In the alternative, venue is proper in Johnson County because all or a substantial part of the events or omissions giving rise to the claims occurred in Johnson County. *Id.* at § 15.002(a)(1).

## VI. Facts

### A. Synagro Manages the City of Fort Worth's Biosolids Program

26.    Synagro Technologies, Inc., markets itself as the preeminent provider of biosolids and residuals solutions services in North America. Synagro claims to "turn waste into worth by helping more than 1,000 municipal, industrial water and wastewater facilities in North America move toward safer, cleaner and more environmentally beneficial practices," and boasts, "we're trusted because we remove risks while keeping the logistics clean."[2] Synagro manages 6.5 million tons of biosolids annually, with 80% of those "beneficially reused," which includes land application.[3]

27.    In 2019, Synagro entered a contract with the City of Fort Worth to manage its biosolids program, which produces about 26,500 dry tons of fertilizer each year. The product is then sold to farmers and landowners in 12 North Texas counties as a cheaper, organic alternative to commercial fertilizer. Per the contract, Synagro built a new biosolids processing facility to produce dry pellet fertilizer called Synagro Granulite ™ Fertilizer. The $59 million project was

---

[2] "Where We Work," *available at:* https://www.synagro.com (last visited Feb. 11, 2024).
[3] "Synagro 2022 Sustainability Report," *available at:* https://www.synagro.com/wp-content/uploads/2023/09/Synagro-Sustainability-Report-2023-Final.pdf at p. 5 (last visited Feb. 11, 2024).

financed through a low-interest loan issued by the Texas Water Development Board. Synagro plans to market the pellets beyond applying them to local farms, and may begin selling them in stores.

28.     Synagro maintains the permits for land application of the wastewater treatment plant biosolids with the Texas Commission for Environmental Quality ("TCEQ") and manages the land application process with oversight by City of Fort Worth staff.

29.     Synagro also maintains the label for its biosolids fertilizer with the Texas Feed and Fertilizer Control Service Office of the State Chemist.

**B. Background Regarding the Presence of PFAS ("Forever Chemicals") in Biosolids.**

30.     Biosolids, also known as sewage sludge, are the product of the wastewater treatment process. They are the treated organic matter derived from human sewage waste. During the wastewater treatment process, liquids are separated from the solids, and the solids are treated to remove some of the toxic ingredients and reduce pathogens.

31.     Synagro claims biosolids "are rich in plant-available nutrients and can be applied to soil as a fertilizer or soil conditioner," and they improve soil health by providing nutrient addition, improved soil structure, and water use.[4]

32.     Nevertheless, many of the pollutants in biosolids are not removed through treatment. These chemicals enter the environment when biosolids are: 1) applied to agricultural lands, home gardens, pastures, and other lands as fertilizer; 2) landfilled; or 3) incinerated.

33.     Biosolids contain a variety of persistent and toxic pollutants, including PFAS, a large class of environmentally persistent synthetic chemicals, which then enter the water and food supply.

---

[4] *Id.* at p. 6.

34.     Because PFAS are environmentally persistent, and many can leach into the groundwater, these chemicals can cause public health and environmental harm long after their release.

35.     PFAS get into biosolids in two ways. First, PFAS are ubiquitous in consumer products such as clothing, household cleaners, carpets, upholstered furniture, personal care products, and makeup. When people use these products, PFAS are washed down the drain and enter sewer systems, where they are sent to wastewater treatment plants ("WWTP"s). Second, many industries use PFAS, and their waste streams are also sent to WWTPs.

36.     While WWTPs do remove some of the chemicals in the wastewater, they do not remove PFAS. In fact, concentrations of PFAS are often higher in the effluent of WWTPs than the influent, indicating that precursor PFAS are biodegrading into new PFAS during the treatment.

37.     Virtually all biosolids-based fertilizers tested have been found to contain large amounts of PFAS.

**C. Synagro Knew or Should Have Known Its Biosolid Product Contains PFAS and Other Toxic Chemicals.**

38.     Synagro touts its role in developing a circular economy—a system of production and consumption designed to reduce waste by reimagining product design, material use, and resource efficiency—by owning and operating processing facilities where Synagro processes biosolids and turns them into compost, fertilizer pellets, and soil conditioners.[5]

39.     Yet, in its 2022 Sustainability Report, Synagro acknowledges that PFAS may be present in the biosolids that Synagro sells as fertilizer: "One of our industry's challenges to move

---

[5] *Id.* at pp. 6-7.

toward a more circular world, is the <u>potential of unwanted substances in biosolids, like per- and polyfluoroalkyl substances (PFAS)</u>."[6]

40.    In fact, Synagro explicitly recognizes that, "PFAS enter public water collection systems through discharges from industrial, commercial, and domestic sources. Each municipality has unique discharge sources and in some cases these substances can potentially be detected in biosolids."[7]

41.    On March 28, 2023, Synagro announced a joint project with CharTech Solutions to deploy high-temperature pyrolysis for PFAS mitigation of thermally dried biosolids. The press release stated: "CHAR and Synagro have been working together for three years to test and apply HTP technology for biosolids to eliminate PFAS."[8] Notably, there would be no need for Synagro to develop such technology if PFAS did not exist in biosolids. Unfortunately, thermal destruction of PFAS-containing wastes can lead to additional health and environmental harm, since PFAS have high thermal stability, and incineration may release harmful byproducts.

---

[6] *Id.* at 21. (emphasis added)

[7] *Id.*

[8] "Synagro and CharTech Solutions to Deploy High-Temperature Pyrolysis for PFAS Mitigation of Thermally Dried Biosolids," March 28, 2023, available at:
https://www.synagro.com/2023/03/28/synagro-and-chartech-solutions-to-deploy-high-temperature-pyrolysis-for-pfas-mitigation-of-thermally-dried-biosolids/ (last visited Feb. 11, 2024).

42.     Further, a 2013 study of biosolids archived from 2001 showed massive quantities of PFAS in all samples.[9] Farmers in Michigan,[10] New Mexico,[11] and Maine[12] are being forced to shut down operations due to PFAS contamination. In 2022, Maine passed a law that prohibits the land application of biosolids.

43.     The United States Environmental Protection Agency ("EPA") in its "PFAS Explained:" document available on its website states: "**Biosolids** Fertilizer from wastewater treatment plants used on agricultural lands can affect ground and surface water."[13]

**D. PFAS are Toxic to Humans.**

44.     As noted above, PFAS are a large family of human-made chemicals that provide heat, stain, and water resistance, making them useful for a range of commercial and industrial applications. All PFAS chemicals contain multiple bonds between atoms of carbon and fluorine, which are extremely strong and give PFAS their exceptional chemical and thermal stability. Due to these strong bonds, PFAS (or in some cases, their degradation products) are highly persistent in the environment and are called "forever chemicals."

---

[9] Venkatesan, AK, Halden, RU. *National inventory of perfluoroalkyl substances in archived U.S. biosolids from the 2001 EPA National Sewage Sludge Survey*. J Hazard Mater. 2013 May 15;252-253:413-8. doi: 10.1016/j.jhazmat.2013.03.016.

[10] Chris Clayton, "Forever Chemicals and Risks to Farms," *Progressive Farmer* (May 9, 2022) *available at* https://www.dtnpf.com/agriculture/web/ag/livestock/article/2022/05/06/michigan-farm-cautionary-tale-pfas (last visited Feb. 12, 2024).

[11] Steve Davies, "New Mexico dairy farmer awaits PFAS relief as Congress looks to boost research funding," *AgriPulse* (June 29, 2022) *available at* https://www.agri-pulse.com/articles/17916-new-mexico-dairy-farmer-awaits-pfas-relief-as-congress-looks-to-boost-research-funding (last visited Feb. 12, 2024).

[12] Kevin Miller, "More than 50 Maine farms impacted by PFAS, but state officials see 'glimmer of hope," *Maine Public* (Feb. 1, 2023) *available at* https://www.mainepublic.org/environment-and-outdoors/2023-02-01/more-than-50-maine-farms-impacted-by-pfas-but-state-officials-see-glimmer-of-hope (last visited Feb. 12, 2024).

[13] EPA, "PFAS Explained:" *available at* https://www.epa.gov/system/files/documents/2023-10/final-virtual-pfas-explainer-508.pdf (last visited Feb. 12, 2024).

45.    Most research on the environmental fate and toxicity of PFAS has focused on the subclass of long-chain perfluoroalkyl acids ("PFAAs"), including perflurooctanoic acid ("PFOA") and perflurooctanesulfonic acid ("PFOS"), and more recently, per- and polyfluoroalkyl ether acids such as GenX chemicals.[14] There is a substantial body of scientific evidence demonstrating that wastes containing long-chain PFAAs or GenX chemicals are toxic, mobile, environmentally persistent, and bioaccumulative.

46.    In the environment, the degrees of persistence, mobility, and bioaccumulation depend on the specific PFAS compound and environmental chemistry. Shorter chain PFAS tend to be more mobile in the environment, while longer chain PFAS tend to have higher sorption. PFAS are also proteinophilic, tending to sorb to proteins in the cells of living organisms and are commonly detected at higher levels in the blood, liver, and kidney. In animals, including fish, longer chain PFAS such as PFOS tend to be more bioaccumulative, and animal tissue concentrations tend to increase as an organism's trophic level increases.

47.    PFAS are associated with cancer and are linked to growth, learning, and behavioral problems in infants and children; fertility and pregnancy problems, including pre-eclampsia; interference with natural human hormones; increased cholesterol and risk of obesity; and immune system problems.[15] Epidemiological studies have found decreased antibody response to vaccines,[16]

---

[14] PFAS with six or more carbons are considered long-chain PFAS, while those with fewer than six carbons are considered short-chain. The two most-studied PFAS are eight carbon PFAS: PFOA and PFOS.

[15] U.S. Dept. of Health and Human Services, Agency for Toxic Substances and Disease Registry, *Toxicological Profile for Perfluoroalkyls*, (May 2021), *available at* https://www.atsdr.cdc.gov/toxprofiles/tp200.pdf (last visited Feb. 12, 2024).

[16] Sunderland, E. M. et. al., *A Review of the Pathways of Human Exposure to Poly- and Perfluoroalkyl Substances (PFASs) and Present Understanding of Health Effects*, 29 JOURNAL OF EXPOSURE SCIENCE AND ENVIRONMENTAL EPIDEMIOLOGY, no. 2, (2018), *available at* https://pubmed.ncbi.nlm.nih.gov/30470793/ (last visited Feb. 12, 2024).

and associations between blood serum PFAS levels and both immune system hypersensitivity and autoimmune disorders like asthma and ulcerative colitis.[17]

48.    According to EPA, "PFAS disrupt signaling of multiple biological pathways resulting in common adverse effects on several biological systems and functions, including thyroid hormone levels, lipid synthesis and metabolism, development, and immune and liver function. Additionally, EPA's examination of health effects information found that exposure through drinking water to a mixture of PFAS can be assumed to act in a dose-additive manner . . . This dose additivity means that low levels of multiple PFAS, that individually would not likely result in adverse health effects, when combined in a mixture are expected to result in adverse health effects."[18]

49.    In 1999, EPA began investigation PFOS after receiving data from 3M Company that the substance is persistent, unexpectedly toxic, and bioaccumulative. By 2000, the company entered into an agreement with EPA promising to phase out all PFOS and PFOA production. In 2006, eight other major PFAS manufacturers likewise agreed to voluntarily phase out PFOA production.

50.    As long-chain PFAAs were phased out by U.S. manufacturers, they were replaced by alternative short-chain and ether-based PFAS such as GenX chemicals, which are being found to have similar health and environmental risks as long-chain PFAAs.

---

[17] *See* U.S. Environmental Protection Agency, *Drinking Water Health Advisory for Perfluorooctanoic Acid (PFOA)*, 39 (May 2016), *available at* https://www.epa.gov/sites/production/files/2016-05/documents/pfoa_health_advisory_final_508.pdf (last visited Feb. 12, 2024).

[18] PFAS National Primary Drinking Water Regulation Rulemaking—Proposed Rule, 88 Fed. Reg. 18,638, 18,639 (May 30, 2023), *available at* https://www.federalregister.gov/documents/2023/03/29/2023-05471/pfas-national-primary-drinking-water-regulation-rulemaking#addresses (last visited on Feb. 12, 2024).

51.     Numerous studies have found toxicity in legacy PFAS, such as PFOS and PFOA. Yet, as scientists study newer replacement PFAS, they are finding similar adverse toxicological outcomes in the new PFAS. A compilation of PFAS toxicity studies shows that virtually every PFAS examined is correlated with adverse health outcomes.[19]

52.     While ingestion of PFAS is the most common route of exposure, scientists are finding that inhalation and dermal absorption are important routes of exposure. The federal Agency for Toxic Substances and Disease Registry states that people working with PFAS "may be exposed to PFAS by inhaling them, getting them on their skin, and swallowing them."[20]

53.     Even small amounts of PFAS are dangerous. In March of 2023, EPA issued proposed drinking water limits for six PFAS, including PFOA and PFOS. The proposed limits are 4 parts per trillion ("ppt") for both PFOA and PFOS individually, but EPA also proposed health-based, non-enforceable Maximum Contaminant Level Goals (MCLGs) of *zero* because "**there is no dose below which either chemical is considered safe**."[21] The other four PFAS EPA proposes to regulate are GenX, PFBS, PFNA, and PFHxS.

54.     On May 8, 2024, EPA designated PFOA and PFOS, including their salts and structural isomers, as hazardous substances under the Comprehensive Environmental Response,

---

[19] PFAS Project Lab, Northeastern University, PFAS-TOX Database, *available at* https://pfasproject.com/pfas-toxic-database/ (last visited Feb. 12, 2024).

[20] ATSDR, Per- and Polyfluoroalkyl Substances (PFAS) and Your Health, *available at* https://www.atsdr.cdc.gov/pfas/health-effects/exposure.html#:~:text=Workers%20may%20be%20exposed%20to,your%20body%20through%20your%20skin (last visited Feb. 12, 2024)

[21] PFAS National Primary Drinking Water Regulation Rulemaking—Proposed Rule, 88 Fed. Reg. 18,638, 18,639 (May 30, 2023), *available at* https://www.federalregister.gov/documents/2023/03/29/2023-05471/pfas-national-primary-drinking-water-regulation-rulemaking#addresses (emphasis added) (last visited on Feb. 12, 2024).

Compensation, and Liability Act ("CERCLA" or "Superfund").[22] EPA found that "both PFOA and PFOS 'may present substantial danger to public health or welfare or the environment when released into the environment' when released into the environment."[23] EPA stated that, "Available information indicates that human exposure to PFOA and/or PFOS is linked to a broad range of adverse health effects, including developmental effects to fetuses during pregnancy or to infants (*e.g.,* low birth weight, accelerated puberty, skeletal variations), liver effects (*e.g.,* tissue damage), immune effects (*e.g.,* antibody production and immunity), and other effects (*e.g.,* cholesterol changes). . . In addition, toxicity assessments . . . indicated that PFOA and PFOS may cause carcinogenic effects in. humans and animals."[24] EPA also concluded that "PFOA and PFOS are persistent in the environment, which can cause long-term exposure" and that they "are also highly mobile in the environment and can migrate away from the initial point of release."[25]

55.    Since there is no current federal regulation of long-chain PFAAs or GenX chemicals, disposal of these PFAS wastes is largely unrestricted, and one common solution for disposal has been to release these substances into city wastewater systems. As a result, the risk of wide-spread environmental pollution and human exposure to PFAS from land application of the biosolids product that remains after wastewater treatment is high and foreseeable.

56.    There are no medical interventions that will remove PFAS from the body.

---

[22] Designation of Perfluorooctanoic Acid (PFOA) and Perfluorooctanesulfonic Acid (PFOS) as CERCLA Hazardous Substances, 89 Fed. Reg. 39124 (May 8, 2024) *available at* https://www.govinfo.gov/content/pkg/FR-2024-05-08/pdf/2024-08547.pdf (last visited Nov. 13, 2024)
[23] *Id.*
[24] *Id.*
[25] *Id.* at 39126.

**E. PFAS biomagnifies in the food chain.**

57.     PFAS in biosolids leach into the soil or ground water, are then taken up by plants, which are subsequently consumed by humans and wildlife.

58.     In 2021, scientists published an article that predicted PFAS uptake and concentrations in different plants from biosolids and calculated the potential exposure to humans and animals consuming harvested vegetation.[26] They determined that EPA's current daily reference doses of PFOA and PFOS[27] could be met by consuming vegetables grown in biosolid amended soils.[28]

59.     Because PFAS can biomagnify,[29] PFAS from soil can be taken up by plants, which are then eaten by animals such as cows, creating contamination of both the milk and the meat.

60.     If water is contaminated with PFAS, fish in those waters also become contaminated. Further, PFAS can lead to acute toxicity and result in death of these fish.

61.     Farms, ranches, and communities can be devastated by the subsequent contamination of water, soil, crops, fish, and livestock. This threat of contamination is not merely hypothetical – it has happened to each of the Plaintiffs in this case.

**F. Plaintiffs' Properties Are Polluted with PFAS and Others Deadly Contaminants.**

62.     In November 2022, Synagro Granulite Fertilizer was left in "smoking" piles smelling like "death and sewage" at a property leased by Coy Nall; the property is located

---

[26] Lasee, S. et al, *The Effects of Soil Organic Carbon Content on Plant Uptake of Soil Perfluoro Alkyl Acids (PFAAs) and the Potential Regulatory Implications,* Environmental Toxicology and Chemistry, Vol 40(3), pp 832-845 (2021).
[27] On June 21, 2022, EPA updated its health advisories for PFOA and PFOS to 0.004 ppt for PFOA, 0.02 ppt for PFOS, 10 ppt for GenX chemicals, and 2,000 ppt for PFBS. *Lifetime Drinking Water Health Advisories for Four Perfluoroalkyl Substances*, 87 Fed. Reg. 36848. EPA's previous lifetime health advisory was 70 ppt for both PFOA and PFOS.
[28] Lasee, S. et al, *supra,* pp 832-845 (2021).
[29] Biomagnification occurs when the chemical concentration in an organism exceeds the concentration of its food where the major exposure route occurs from the organism's diet.

approximately 0.57 miles northeast along County Road 102 from the intersection with County Road 204 near Grandview, Johnson County, Texas. The piles were not mixed into the soils until mid-January 2023.

63.     Plaintiffs who live, work, and own property adjacent to the Nall site, complained of the smells and reported the biosolids piles to the Texas Commission on Environmental Quality and Johnson County Constable's Office. Detective Dana Ames, Johnson County's Environmental Crimes Investigator, opened an investigation.

64.     Detective Ames obtained soil, surface water, and well water samples, and the County Commissioners' Court approved payment for their testing at a laboratory qualified to test for PFAS. The results indicate high levels of PFAS and other toxic chemicals in the soil, surface water, and well water. Thirty-two individual PFAS were found in the soil and water. All the sites tested had at least one PFAS. Moreover:

- **The drinking water well on the Alessi property tested at <u>90.9</u> ppt of PFAS.**

- **One drinking water well on the Schultz's property tested at <u>268.2</u> ppt of PFAS, and the other water well on the Schultz's property tested at <u>192.7</u> ppt of PFAS.**

- The soils on the Plaintiffs' properties tested in the range of 97 ppt of PFAS to **6,291 ppt of PFAS.**

- The **surface water** on the Plaintiffs' properties tested in the range of 84,700 ppt PFAS to **<u>1,333.61</u> ppt of PFAS**.

65.     Detective Ames then obtained tissue samples from two fish and two calves (one stillborn and one that died one week after birth) from Plaintiffs' properties and had those tested. **One fish tested at <u>74,460</u> ppt of PFAS** (including 74,000 ppt of PFOS), **and the other fish tested at <u>57,000</u> ppt of PFOS.** The week-old calf tissue tested at 3,200 ppt of PFAS (including 2,400 ppt

of PFOS) (the liver was not tested). The stillborn calf tissue tested at 1,490 ppt of PFAS, **while the liver of the stillborn calf tested at <u>620,228</u> ppt of PFAS** (including 610,000 of PFOS).

66.    To put these numbers in context, if a person consumed one of the fish in the pond on Plaintiffs Farmer and Alessi's property, one single serving (8 ounces) would exceed the EPA reference dose for PFOS exposure by ***<u>30,000 times</u>***.[30]

67.    Similarly, if a person consumed the calf liver from the calf born on Plaintiffs Schultz and Coleman's ranch, one single serving would exceed the EPA reference does for PFOS exposure by ***<u>250,000 times</u>***.

68.    Three of the water wells on Plaintiffs' properties that are polluted with PFAS are all cased wells drilled to about 250 feet below ground surface and draw from the Woodbine Aquifer, which is a minor aquifer located in northeast Texas. The Woodbine Aquifer provides water for municipal, industrial, domestic, livestock, and small irrigation supplies stretching across 17 counties. It overlays the Trinity Aquifer, which is a major aquifer and critical water source for millions of people in Texas.

### G.  Synagro's Granulite ™ Fertilizer Tests Positive for Many of the Same PFAS Found on Plaintiffs' Properties.

69.    At the grand opening of Synagro's Village Creek Biosolids Processing Facility on December 1, 2022, Synagro handed out samples of its finished biosolids product labeled Granulite ™ Fertilizer 4-4-0 (Produced @ Village Creek WRF-Fort Worth, TX). Detective Ames obtained a sample and had it tested.

---

[30] A reference dose ("RfD") is defined as an estimate of a daily exposure to the human population (including sensitive subpopulations) that is likely to be without an appreciable risk of deleterious effects during a lifetime.

70.     Synagro's biosolids product tested positive for twenty-seven individual PFAS including: 1) PFBS; 2) PFHxA; 3) PFHxS; 4) PFHpA; 5) PFOA; 6) PFOS; 7) PFNA; 8) PFDA; 9) PFUnDA; 10) PFDoDA; and 11) PFBA. All of the 11 PFAS listed have sufficient scientific information, including concentration data, human health toxicity data, ecological toxicity data, and environmental fate and transportation data, demonstrating that they adversely affect public health and the environment. The Synagro Granulite Fertilizer sample tested with a total of 35,610 ppt PFAS and other toxic chemicals.

71.     Of these 11 PFAS, extremely high concentrations of eight of them have been found on the Plaintiffs' properties through the testing directed by Detective Ames.

72.     Thirteen of the twenty-seven PFAS identified in the Synagro Granulite Fertilizer are present in the soil and water samples Johnson County took from Plaintiffs' properties.

**H.  Prior to Synagro, Renda Managed the City of Fort Worth's Biosolids Program**

73.     Biosolids from the City of Fort Worth were previously managed by Renda. Based on information and belief, these biosolids were applied to lands adjacent to Plaintiffs' properties by the same neighboring farmer.

74.     Similar to Synagro, Renda touts "years of experience processing excellent quality biosolids" and beneficial reuse of the biosolids "to aid local farmers and ranchers" and for the "betterment of society." Yet, Renda, like Synagro, knew or should have known that its biosolid product contained PFAS and other toxic chemicals.

**I.  Impact on Plaintiffs**

***Plaintiffs Farmer and Alessi***

75.     Since Mr. Nall's application of the Synagro Granulite Fertilizer on his leased pastureland in November 2022 which has polluted the soil, surface water, and drinking water on

Plaintiffs' property, Plaintiffs James Farmer and Robin Alessi have suffered medical issues that may be linked to PFAS exposure, including high blood pressure, respiratory and cardiac issues, generalized pain, and skin irritations.

76.     Mr. Farmer and Ms. Alessi have many farm and household pets that have recently died including dogs, horses, a newborn bull calf, fish in their stock ponds (catfish, perch, bass, and minnow), peacocks, ducks, chickens, guineas, and cranes. Their cats and dogs appear to be suffering from new medical issues. All the animals drink well water or pond water directly, and they graze off the pastures and eat hay grown on the property.

77.     Mr. Farmer and Ms. Alessi have grown a vegetable garden every year and relied on the produce as food, which they can no longer do.

78.     Now that their property and only water source is polluted with "forever chemicals," they face the stark possibility of having to abandon the home they love and the property they have developed into a working ranch, raising cattle, freshwater fish, and game birds, which may have to be euthanized since they cannot be safely consumed.

79.     Mr. Farmer and Ms. Alessi have started to purchase bottled water for drinking and cooking, but they must shower, do dishes, clean the house, and water their animals with well water which is polluted.

80.     Their property is their main asset which has been rendered worthless and will be costly and difficult to clean up and restore.

**Plaintiffs Schultz and Coleman**

81.     Since Mr. Nall's application of the Synagro Granulite Fertilizer on his leased pastureland in November 2022 which has polluted the soil, surface water, and drinking water on Plaintiffs' property, Plaintiffs Karen Coleman and Tony Coleman have suffered medical issues

that may be linked to PFAS exposure. In August 2023, Mrs. Coleman suffered from a mass on her thoracic spine: a bone lesion and mass with severe compression of her spinal canal that presents a high risk of paralysis. She has continued intermittent pain that radiates around her left rib cage and weakness in her left hip and required insulin after the surgery. She now is being monitored for pre-diabetes. Mr. Coleman never suffered any medical issues until recently when he contracted an upper respiratory virus which continued to worsen for a lengthy period of time.

82.    The Colemans lease Mrs. Schultz's property to raise cattle for hay production and, since the biosolids application in November 2022, many heifers, calves, and a bull have died.

83.    The liver of the stillborn calf that died in December 2023 tested with 610,000 ppt of PFOS. Because the calf was stillborn, all the PFOS in the calf's body was from the mother cow (*e.g.,* the placenta and mother's blood). To put the PFOS level in perspective, Maine issued a consumption advisory for beef with PFOS with an action level of 3,400 ppt of PFOS for children and 7,300 ppt of PFOS for adults.[31] In addition, Michigan requires a farm to shut down and issued a consumption advisory when beef from cattle tested between 980 to 2800 ppt of PFOS.[32] The PFOS level found in the Plaintiffs' stillborn calf exceeded those levels by magnitudes of hundreds.

84.    Now that Mrs. Schultz's property and only water source are polluted with "forever chemicals," she and the Colemans (her daughter and son-in-law) face the stark possibility of having to abandon the home they love and the property they have developed into a working cattle

---

[31] Maine Action Levels for PFOS in beef for use in determining whether beef at a farm is adulterated (Aug. 4, 2000) *available at* https://www.maine.gov/dep/spills/topics/pfas/PFOS-Action-Levels-for-Beef-Derivation-Memo-08.04.20.pdf (last visited Feb. 14, 2024).
[32] Garrett Ellison, "Advisory warns of PFAS in beef from Michigan cattle farm," *MLive* (Jan. 28, 2022) *available at* https://www.mlive.com/public-interest/2022/01/advisory-warns-of-pfas-in-beef-from-michigan-cattle-farm.html (last visited Feb. 14, 204).

ranch. They are suffering significant daily economic losses due to the inability to market their cattle or beef or hay and may have to euthanize their entire herd, a crushing and emotional task.

85. Mrs. Schultz and the Colemans have purchased and installed water filters for the house have purchases bottled water for drinking and cooking, but they must shower, do dishes, clean the house, and water their animals with well water which is polluted.

86. Mrs. Schultz's property is her main asset which has been rendered worthless and will be costly and difficult to clean up and restore. She had intended for her daughter and son-in-law to inherit the property they visit and work on daily. The Colemans have lost income and may have to completely shut down the business they have worked so hard to build.

### *Plaintiffs Alton and Christopher Bryant*

87. Alton Bryant is the owner of property impacted by Defendants. Both Mr. Bryant, and his son Christopher Bryant, reside on the property. As with the other Plaintiffs named herein, the property has been in the family and was intended to stay within the family. The property is one of their main assets, has been rendered worthless and will be costly and difficult to clean up and restore.

## VII.  Causes of Action

### COUNT I
### Strict Liability – Product Defect
### Abnormally Dangerous/Failure to Warn/Defective Design

88. Plaintiffs incorporate each of the foregoing allegations as if fully stated herein.

89. As a manufacturer, formulator, distributer, supplier, seller, and marketer of these biosolid fertilizers, Synagro (as manufacturer of Granulite Fertilizer) and Renda (as manufacturer of its biosolid product), each owed a duty to all persons whom its biosolids fertilizer might

foreseeably harm, not to market or sell any product which poses an unreasonable risk of injury for its intended and foreseeable uses.

90.     Synagro and Renda each manufactured, formulated, distributed, supplied, sold, and/or marketed their respective biosolid fertilizer products which each contained a defective condition because: (1) there was a flaw in the product at the time of sale making it more dangerous than intended; (2) the manufacturer of the product failed to warn adequately of a risk or hazard related to the way the product was designed; and/or (3) the product had a defective design.

91.     The defective condition existed at the time each product left the control of Synagro and Renda. The biosolids fertilizers were each unreasonably dangerous to the user or consumer, including Plaintiffs. The biosolids fertilizer were expected to and did reach users such as Coy Nall without substantial change in its condition. The defect was a cause of Plaintiffs' damages.

92.     Defendants knew, or reasonably should have known, of the foreseeable risks and defects of its respective biosolids fertilizers. Defendants nonetheless failed to provide adequate warnings of the known and foreseeable risk or hazard related to the way the fertilizers were designed, including pollution of properties and water supplies with PFAS. Defendants also failed to provide adequate instructions regarding the use and disposal of its biosolids fertilizer to prevent pollution of properties and water supplies with PFAS.

93.     Defendants knew or reasonably should have known that their products were to be purchased and used by farmers like Coy Nall without inspection for defects.

94.     When these manufacturers placed their fertilizers into the stream of commerce, the fertilizers were defective, unreasonably dangerous, and not reasonably suited for intended, foreseeable and ordinary transportation, storage, handling, and uses for the following reasons, among others:

a.  It contained PFAS, which are persistent and mobile in the environment, and exposure can lead to adverse human health effects, including high cholesterol, changes in liver enzymes, decreased immune response to vaccination, thyroid disorders, pregnancy-induced hypertension and preeclampsia, and cancer (testicular and kidney for PFOA, liver and thyroid for PFOS);

b.  PFAS chemicals have a tendency to mix with groundwater and migrate great distances;

c.  PFAS compounds readily escape from PFAS products and have a tendency to mix with nearby waste;

d.  Unintended discharges of PFAS from PFAS products are commonplace;

e.  PFAS products cause extensive groundwater contamination when used and disposed of in a foreseeable and intended manner;

f.  PFAS compounds persist in the environment and resist biodegradation;

g.  Certain PFAS compounds biodegrade to other PFAS compounds;

h.  Even at extremely low levels, PFAS render drinking water unsuitable for human use and consumption;

i.  PFAS pose significant threats to the public health and welfare and the environment;

j.  It also contained other toxic chemicals that remain after the wastewater treatment process.

k.  Defendants failed to conduct reasonable, appropriate, or adequate scientific studies to evaluate the environmental fate and transport and potential human health effects of PFAS and other toxic chemicals in biosolids before marketing its fertilizer;

95.     Feasible alternatives that would have eliminated the unreasonable danger posed by these fertilizers containing PFAS and other toxic chemicals, without excessive costs or loss of product efficiency, were available.

96.     Defendants' fertilizers were dangerous to an extent beyond that which would be contemplated by the ordinary consumer, and/or the risk of harm to public health and welfare and the environment posed by these fertilizers each outweighed the cost to the defendant of reducing or eliminating such risk.

97.     Defendants' fertilizers were used in a manner they were foreseeably intended to be used and without substantial change in its condition, and as a result of the defects previously described, these fertilizers proximately caused Plaintiffs to sustain the injuries and damages set forth in the Complaint:

    a.  Plaintiffs' water supplies were and continue to be polluted with PFAS and other toxic chemicals;

    b.  Plaintiffs were exposed to hazardous chemical substances through their ordinary use of polluted water for drinking, cooking, bathing, and cleaning;

    c.  Plaintiffs' properties were and continue to be polluted such that they have incurred, are incurring, and will incur, substantial costs for investigation, remediation, cleanup, restoration, removal, treatment, and monitoring; and

    d.  Plaintiffs have lost income and incurred substantial expenses because they cannot market their cattle, fish, or game birds, which have been exposed to PFAS and other toxic chemicals and tested positive for the same.

98.     As a further direct and proximate result of the acts and omissions of the Defendants alleged in this Complaint, Plaintiffs have sustained and will sustain other substantial expenses and

damages, in an amount within the jurisdictional limits of this Court for which Defendants are strictly, jointly, and severally liable.

99.    Defendants knew that it was substantially certain that the acts and omissions described above would threaten public health and cause extensive pollution of property and drinking water supplies. Defendants committed each of the above-described acts and omissions with conscious or deliberate disregard of the foreseeable harm resulting from the defective product. Such conduct was not the result of mistake of fact or law, honest error or judgment, overzealousness, mere negligence, or other human failing, but was a bad faith decision to market and promote sales of biosolids fertilizer, knowing of the defect and danger, in conscious or deliberate disregard of the threat to the safety of Plaintiffs.

100.    Defendants' product proximately caused injury to Plaintiffs, which resulted in the following damages:

    a.  Loss of market value;

    b.  Cost of repairs;

    c.  Loss of use and enjoyment of the property;

    d.  Diminution in market value damages after repair including stigma damages;

    e.  Damages for the intrinsic value of the trees and plants that died or have been distressed;

    f.  Mental anguish;

    g.  Expenses;

    h.  Lost income;

    i.  Exemplary damages; and

    j.  Court costs.

### COUNT II
**Negligence**

101.    Plaintiffs incorporate each of the foregoing allegations as if fully stated herein.

102.    As a manufacturer, formulator, distributer, supplier, seller, and marketer of these biosolid fertilizers, Synagro (as manufacturer of Granulite Fertilizer) and Renda (as manufacturer of its biosolid product), each owed a legal duty to all persons whom its biosolids fertilizer might foreseeably harm, not to market or sell any product which poses an unreasonable risk of injury for its intended and foreseeable uses.

103.    Defendants had a legal duty to exercise due care in the design, manufacture, formulation, handling, control, disposal, promotion, marketing, distribution, sale, testing, labeling, use, and provision of product information and instructions for use of each manufacturer's respective fertilizers.

104.    Defendants so negligently, carelessly, and recklessly designed, manufactured, formulated, handled, controlled, disposed, promoted, marketed, distributed, sold, tested, labeled, used, and provided product information and instructions for use of their fertilizers that they breached their duties and each directly and proximately caused Plaintiffs' properties including their drinking water wells to be polluted with PFAS and other toxic chemicals.

105.    Defendants failed to conduct reasonable, appropriate, or adequate scientific studies to determine the presence of PFAS and other toxic chemicals or evaluate the environment fate and transport characteristics of PFAS and other toxic chemicals in their fertilizers, including the likelihood that the use and disposal of their biosolids fertilizers would cause PFAS and other toxic chemicals to pollute properties and water supplies, render drinking water unusable and unsafe, and threaten public health and welfare and the environment.

106.    Defendants manufactured, promoted, marketed, supplied, and/or otherwise placed into the stream of commerce their respective fertilizer products when they knew or reasonably should have known that customers would use the biosolids fertilizer without understanding that (1) it contained PFAS and other toxic chemicals and (2) land application of the biosolids fertilizer would cause PFAS and other toxic chemicals to migrate into the soil and water, thereby polluting it with persistent, toxic, and bioaccumulate chemicals that are difficult and costly to remove.

107.    Defendants did not provide any warnings regarding the potential for property and water pollution with PFAS or other toxic chemicals from land application of their fertilizers. Nor did Defendants take any precautionary measures to prevent or mitigate such pollution.

108.    Plaintiffs have suffered actual injury or loss. As a direct and proximate result of Defendants' acts and omissions alleged in this Complaint:

   a.    Plaintiffs' water supplies were and continue to be polluted with PFAS and other toxic chemicals;

   b.    Plaintiffs were exposed to hazardous chemical substances through their ordinary use of polluted water for drinking, cooking, bathing, and cleaning;

   c.    Plaintiffs' properties were and continue to be polluted such that they have incurred, are incurring, and will incur, substantial costs for investigation, remediation, cleanup, restoration, removal, treatment, and monitoring; and

   d.    Plaintiffs have lost income and incurred substantial expenses because they cannot market their cattle, fish, or game birds, which have been exposed to PFAS and other toxic chemicals and tested positive for the same.

109.    As a further direct and proximate result of the acts and omissions of the Defendants alleged in this Complaint, Plaintiffs have sustained and will sustain other substantial expenses and

damages, in an amount within the jurisdictional limits of this for which Defendants are strictly, jointly, and severally liable.

110.    Defendants knew that it was substantially certain that the acts and omissions described above would threaten public health and cause extensive pollution of property and drinking water supplies. Defendants committed each of the above-described acts and omissions with conscious or deliberate disregard of the foreseeable harm resulting from the defective product. Such conduct was not the result of mistake of fact or law, honest error or judgment, overzealousness, mere negligence, or other human failing, but was a bad faith decision to market and promote sales of biosolids fertilizer, knowing of the defect and danger, in conscious or deliberate disregard of the threat to the safety of Plaintiffs. Therefore, Plaintiffs request an award of exemplary and punitive damages in an amount reasonable, appropriate, and sufficient to punish these Defendants and deter them from ever committing the same or similar acts.

111.    Defendants' negligence proximately caused injury to Plaintiffs, which resulted in the following damages:

    a.   Loss of market value;

    b.   Cost of repairs;

    c.   Loss of use and enjoyment of the property;

    d.   Diminution in market value damages after repair including stigma damages;

    e.   Damages for the intrinsic value of the trees and plants that died or have been distressed;

    f.   Mental anguish for intentional conduct;

    g.   Expenses;

    h.   Lost income;

     i.    Exemplary damages; and

     j.    Court costs.

*COUNT III*
**Private Nuisance**

112.    Plaintiffs reallege and reaffirm the allegations set forth in the preceding paragraphs.

113.    Defendants have unreasonably and substantially interfered with, and continue to substantially interfere with, Plaintiffs' use and enjoyment of their property by producing and marketing a biosolids fertilizer that has polluted Plaintiffs' property with PFAS and other toxic chemicals as a direct and proximate result of the intentional and unreasonable, negligent, and reckless conduct alleged in this Petition.

114.    Defendants' substantial interference with Plaintiffs' interest in the use and enjoyment of their property has caused Plaintiffs unreasonable discomfort, annoyance, and inconvenience.

115.    Defendants have caused physical damage to Plaintiffs' property, economic harm to the property market value, and psychological harm to Plaintiffs' "peace of mind" in the use and enjoyment of their property.

116.    Defendants' interference with Plaintiffs' interests is temporary because it can be repaired, fixed, or restored and any anticipated recurrence would be only occasional, irregular, intermittent, and not reasonably predictable, such that future injury could not be estimated with reasonable certainty.

117.    In the alternative, Defendants' interference with Plaintiffs' interests is permanent because either (a) the damage is not capable of being repaired, fixed, or restored, or (b) even if capable of repair, there is substantial certainty the injury will repeatedly, continually, and regularly recur, such that future injury can be reasonable evaluated.

116.    Plaintiffs have suffered actual injury or loss. As a direct and proximate result of Defendants' acts and omissions alleged in this Complaint:

    a.  Plaintiffs' water supplies were and continue to be polluted with PFAS and other toxic chemicals;

    b.  Plaintiffs were exposed to hazardous chemical substances through their ordinary use of polluted water for drinking, cooking, bathing, and cleaning;

    c.  Plaintiffs' properties were and continue to be polluted such that they have incurred, are incurring, and will incur, substantial costs for investigation, remediation, cleanup, restoration, removal, treatment, and monitoring; and

    d.  Plaintiffs have lost income and incurred substantial expenses because they cannot market their cattle, fish, or game birds, which have been exposed to PFAS and other toxic chemicals and tested positive for the same.

117.    As a further direct and proximate result of the acts and omissions of the Defendants alleged in this Complaint, Plaintiffs have sustained and will sustain other substantial expenses and damages, in an amount within the jurisdictional limits of this for which Defendants are strictly, jointly, and severally liable.

118.    Defendants knew that it was substantially certain that the acts and omissions described above would threaten public health and cause extensive pollution of property and drinking water supplies. Defendants committed each of the above-described acts and omissions with conscious or deliberate disregard of the foreseeable harm resulting from the defective product. Such conduct was not the result of mistake of fact or law, honest error or judgment, overzealousness, mere negligence, or other human failing, but was a bad faith decision to market and promote sales of biosolids fertilizer, knowing of the defect and danger, in conscious or

deliberate disregard of the threat to the safety of Plaintiffs. Therefore, Plaintiffs request an award of exemplary and punitive damages in an amount reasonable, appropriate, and sufficient to punish these Defendants and deter them from ever committing the same or similar acts.

118.    Defendants' interference with Plaintiffs' interests caused injury to Plaintiffs, which resulted in the following damages:

      a.     Loss of market value;

      b.     Cost of repairs;

      c.     Loss of use and enjoyment of the property;

      d.     Diminution in market value damages after repair including stigma damages;

      e.     Personal discomfort, annoyance, frustration, and inconvenience;

      f.     Damages for the intrinsic value of the trees and plants that died or have been distressed;

      g.     Mental anguish for intentional conduct;

      h.     Expenses;

      i.     Lost income;

      j.     Exemplary damages; and

      k.     Court costs.

119.    In addition, to remedy the continuing nuisance caused by Defendants' conduct, Plaintiffs request the mandatory injunction described below.

### COUNT IV
### Application for Mandatory Injunctive Relief

120.    Plaintiffs seek a mandatory injunction requiring (1) a site investigation resulting in full vertical and horizontal delineation of impacted soils, groundwater, and surface water, and (2) cleanup and restoration of the property that results, at a minimum, in the complete removal of

chemical constituents released, no impact to surface or groundwater, and the land returned to the condition prior to any pollution or contamination.

## VIII.  Jury Demand

121.    Plaintiffs demand a trial by jury and herewith tender the appropriate fee.

## IX. Conditions Precedent

122.    All conditions precedent have been performed or have occurred.

## X. Statement Regarding Use of Documents

123.    Pursuant to Texas Rule of Civil Procedure 193.7, Plaintiffs hereby give notice that any and all documents produced by Defendants in this matter may be used against Defendants at any pre-trial proceeding or at trial without the necessity of authenticating the produced documents.

## PRAYER FOR RELIEF

For these reasons, Plaintiffs ask that the Court issue citation for each Defendant to appear and answer, and that Plaintiffs be awarded a judgment against Defendants for the following:

a.    Actual, special, and consequential damages;

b.    Mandatory injunction requiring (1) a site investigation resulting in full vertical and horizontal delineation of impacted soils, groundwater, and surface water, and (2) cleanup and restoration of the property that results, at a minimum, in the complete removal of chemical constituents released, no impact to surface or groundwater, and the land returned to the condition prior to any pollution or contamination.

c.    Mental anguish damages;

d.    Exemplary damages;

e.    Prejudgment and postjudgment interest;

f.    Court costs;

g.    Attorneys' fees; and

h.    All other relief to which Plaintiffs are entitled.


DATE:  November 15, 2024          Respectfully submitted,

**GUERRERO & WHITTLE, PLLC**

By: _____*/s/ Mary Whittle*_____
       Mary Whittle
       Texas Bar No. 24033336
       Mark Guerrero
       Texas Bar No. 24032377
       510 Baylor Street
       Austin, Texas 78703
       (512) 605-2300 phone
       (512) 222-5280 fax
       mary@gwjustice.com
       mark@gwjustice.com

**ATTORNEYS FOR PLAINTIFFS**

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Mary Whittle on behalf of Mary Melissa Whittle
Bar No. 24033336
mary@gwjustice.com
Envelope ID: 94369120
Filing Code Description: Petition
Filing Description: Original Petition and Application for Mandatory Injunction-Jury fee paid
Status as of 11/18/2024 8:50 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Ketan UKharod | | ketan@gwjustice.com | 11/15/2024 5:01:15 PM | SENT |
| Mark Guerrero | | mark@gwjustice.com | 11/15/2024 5:01:15 PM | SENT |
| Mary Whittle | | mary@gwjustice.com | 11/15/2024 5:01:15 PM | SENT |