# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### (Dallas Division)

| | | |
|---|---|---|
| **ROBIN ALESSI,** *et. al.* | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | **Civil No. 3:25-CV-0445-K** |
| **v.** | § | |
| | § | |
| **SYNAGRO TECHNOLOGIES, INC.,** *et al.* | § | |
| | § | |
| **Defendants.** | § | |

## SECOND AMENDED COMPLAINT—CLASS ACTION

James Farmer, Robin Alessi, Patsy Schultz, Karen Coleman, Tony Coleman, Alton Morton Bryant, and Christopher Michael Bryant, Plaintiffs, bring this suit against Synagro Technologies, Inc., Synagro of Texas—CDR, Inc., (collectively "Synagro") and Renda Environmental, Inc. ("Renda"), on behalf of themselves and all persons similarly situated, and allege the following based on personal knowledge as to allegations regarding themselves and on information and belief as to other allegations:

## NATURE OF THE ACTION

1.      Plaintiffs' farms were poisoned by toxic chemicals in a biosolids fertilizer produced and marketed by Defendants when a neighboring farmer spread it on his crops.

2.      This is an action for damages suffered by Plaintiffs as a direct and proximate result of Defendants' negligent and wrongful conduct in connection with the design, development, manufacture, testing, promoting, marketing, advertising, distribution, labeling, and/or sale of biosolids fertilizers containing PFAS and other toxic chemicals (including heavy metals, estrogens/endocrine disrupters, and pharmaceuticals).

3.      Defendant Synagro contracts with more than a thousand municipal wastewater facilities across North America, including the City of Fort Worth, Texas (until April 1, 2025).

4.      Synagro uses the biosolids from those wastewater facilities, also known as "sewage sludge," to make Synagro Granulite Fertilizer. During the wastewater treatment process, liquids are separated from solids, and the solids are treated to remove some toxic ingredients and reduce pathogens. However, even after treatment, biosolids typically contain a variety of persistent pollutants.

5.      Prior to Synagro's contract with the City of Fort Worth, Texas, Defendant Renda Environmental contracted with the city to manage the biosolids from its wastewater facilities. Renda also produced and marketed a biosolids fertilizer that was applied by the same neighboring farmer to his land.

6.      Per- and polyfluoroalkl substances, or "PFAS," are a large family of human-made chemicals that provide heat, stain, and water resistance, making them useful for a range of commercial and industrial applications. All PFAS chemicals contain multiple bonds between atoms of carbon and fluorine, which are extremely strong and give PFAS their exceptional chemical and thermal stability. Due to these strong bonds, PFAS (or in some cases, their degradation products) are highly persistent in the environment and are called "forever chemicals."

7.      Human exposure to PFAS is associated with cancer, birth defects, developmental damage to infants, and impaired functioning of the liver, kidneys, and immune system. PFAS are also toxic to animals.

8.      Because PFAS are not removed by conventional wastewater treatment, they accumulate in the biosolids that Defendants use to make their fertilizer, which Defendants falsely market as being safe and organic.

9.     Plaintiffs' land has been exposed to PFAS and other toxic chemicals (including heavy metals, estrogens/endocrine disrupters, and pharmaceuticals) through Defendants' biosolids fertilizers. As a result, Plaintiffs' have suffered devastating damage to their livestock, and the land where they live and work has been rendered nearly worthless.

10.     Plaintiffs were unaware that the injuries described herein were attributable to the fertilizers that were applied to their neighbor's land and apparently migrated to Plaintiffs' lands until Johnson County tested Plaintiffs' properties, their livestock, and the Synagro Granulite Fertilizer for PFAS and other toxic chemicals as part of a criminal investigation.

11.     On behalf of themselves and the "Class" as defined below, Plaintiffs seek damages, restitution, and injunctive relief for the harm caused by Defendants' fertilizers.

12.     Plaintiffs do not seek by this action to restrain any agricultural operation, and neither the claims nor the relief sought runs afoul of the provisions of the Texas Right to Farm Act. Rather than restrain Defendants from continuing to operate, this action seeks a mandatory injunction requiring Defendants to clean up and restore Plaintiffs' properties from harm caused by a defective product that migrated to their lands. Moreover, neither Defendant currently produces or markets biosolids from the Fort Worth facility. The Fort Worth City Council voted unanimously to end its ten-year contract with Synagro as of April 1, 2025.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5,000,000, exclusive of interest and costs. Upon information and belief, the number of class members is over 100, many of whom have different citizenship from a Defendant. Thus, minimal diversity exists under 28 U.S.C. § 1332(d)(2)(A).

14.     Venue is proper in the Northern District of Texas because the actions upon which these claims are based occurred in Johnson County, Texas, and the property that is the subject of this action is situated in Johnson County, Texas. *See* 28 U.S.C. § 1391(b)(2). Furthermore, Defendants manufactured, distributed, marketed, and sold biosolids fertilizers within the Northern District of Texas.

## **PARTIES**

15.     Plaintiff James Farmer resides at 12125 County Road 102, Grandview, Texas 76050, which has been impacted by the land application of Defendants' biosolids fertilizer. He is Plaintiff Robin Alessi's partner and has resided at and taken care of the property since December 2013.

16.     Plaintiff Robin Alessi owns the property at 12125 County Road 102, Grandview, Texas 76050, which has been impacted by the land application of Defendants' biosolids fertilizer. She purchased the property in 2010 and has resided there since that time.

17.     Plaintiff Patsy Schultz resides at 12201 County Road 102, Grandview, Texas 76050, which has been impacted by the land application of Defendants' biosolids fertilizer. She and her husband, James Schultz, purchased the property in 2002, and she inherited his share after his passing in 2018.

18.     Plaintiff Karen Coleman resides at 4145 Burleson Retta Road, Burleson, Texas 76028. Mrs. Coleman is Patsy Schultz's daughter and leases for cattle grazing her mother's property at 12201 County Road 102, Grandview, Texas 76050, which has been impacted by the land application of Defendants' biosolids fertilizer.

19.     Plaintiff Tony Coleman resides at 4145 Burleson Retta Road, Burleson, Texas 76028. He is Patsy Schultz's son-in-law and leases for cattle grazing the property at 12201 County

Road 102, Grandview, Texas 76050, which has been impacted by the land application of Defendants' biosolids fertilizer.

20.     Plaintiff Alton Morton Bryant resides at 12804 County Road 102, Grandview, Texas 76050. Mr. Bryant owns this property, which has been impacted by the land application of Defendants' biosolids fertilizer.

21.     Plaintiff Christopher Michael Bryant resides at 12800 County Road 102, Grandview, Texas 76050. Mr. Bryant lives on this property, which has been impacted by the land application of Defendants' biosolids fertilizer.

22.     Defendant Synagro Technologies, Inc. is a Delaware corporation, with a principal office located at 435 Williams Court, Ste. 100, Baltimore, Maryland 21220, and has been served and appeared through counsel.

23.     Defendant Synagro of Texas—CDR, Inc. is a Texas corporation, with a principal office located at 435 Williams Court, Ste. 100, Baltimore, Maryland 21220, and has been served and appeared through counsel.

24.     Defendant Renda Environmental, Inc. is a Texas corporation, with a principal office located at 522 Benson Lane, Roanoke, Texas 76262, and has been served and appeared through counsel.

## FACTUAL ALLEGATIONS

### A.  Synagro Managed Fort Worth's Biosolids Program from 2019 to April 1, 2025.

25.     Synagro Technologies, Inc., markets itself as the preeminent provider of biosolids and residuals solutions services in North America. Synagro claims to "turn waste into worth by helping more than 1,000 municipal, industrial water and wastewater facilities in North America move toward safer, cleaner and more environmentally beneficial practices," and boasts, "we're

trusted because we remove risks while keeping the logistics clean."[1] Synagro manages 6.5 million tons of biosolids annually, with 80% of those "beneficially reused," which includes land application.[2]

26.     In December 2019, Synagro entered a contract with the City of Fort Worth to manage its biosolids program, which produces about 26,500 dry tons of fertilizer each year at the Village Creek Water Reclamation Facility located at 4500 Wilma Lane, Arlington, Texas 76112.[3] The product is then sold to farmers, ranchers, and landowners in Texas as a cheaper, organic alternative to commercial fertilizer.

27.     Per the contract, Synagro built a new biosolids processing facility to produce dry pellet fertilizer called Synagro Granulite Fertilizer.

28.     Farmers and other users could pick up Granulite pellets at Synagro's Fort Worth Biosolids Dewatering and Processing Facility. Sales were arranged via email and telephone communications with a Synagro salesperson located in Virginia. An image of the product label is below.

---

[1] "Where We Work," *available at:* https://www.synagro.com (last visited Feb. 11, 2024).
[2] "Synagro 2022 Sustainability Report," *available at:* https://www.synagro.com/wp-content/uploads/2023/09/Synagro-Sustainability-Report-2023-Final.pdf at p. 5 (last visited Feb. 11, 2024).
[3] Service Contract for Design, Permitting, Construction, Operation, Maintenance, Repair and Improvement of the City of Fort Worth's Biosolids Management and Beneficial Reuse from the Village Creek Water Reclamation Facility, City Project Number 101961, between The City of Fort Worth, Texas, and Synagro of Texas-CDR, Inc.

**SYNAGRO**

**GRANULITE™ FERTILIZER**
**4-4-0**

**Guaranteed Analysis:**
Total Nitrogen (N) .............................................. 4.0 %
Available Phosphate (as $P_2O_5$) ........................... 4.0%
Soluble Potash ($K_2O$) .......................................0.0%

RECOMMENDED APPLICATION RATES FOR BULK USE**

| Nitrogen Requirement | Granulite Recommended |
|---|---|
| 100 lbs./acre/year | 2.5 tons/acre/year |
| 125 lbs./acre/year | 3.1 tons/acre/year |
| 150 lbs./acre/year | 3.75 tons/acre/year |
| 175 lbs./acre/year | 4.4 tons/acre/year |
| 200 lbs./acre/year | 5.0 tons/acre/year |

Use above table or following formula to calculate application rates:
$$\frac{\text{lbs./acre of nitrogen needed by crop}}{40} = \text{tons/acre Granulite recommended}$$
** Rates based on 50% plant available nitrogen for the first growing season

Net Weight: BULK
Derived from:  Municipal biosolids

This biosolids product meets the criteria of subsection §65.13-Waste Products Distributed as Fertilizers in the Texas Administrative Code, Title 4. Agriculture, Chapter 65, Commercial Fertilizer Rules (amended June 30, 2014).

Information about the components of this lot of fertilizer may be obtained by writing to Synagro Product Sales, 435 Williams Court, Suite 1000, Baltimore, MD 21220, or by telephone at (800) 573-5538

Molybdenum Warnings:
•  Warning - Application according to the directions for use EXCEEDS the allowable limits of certain trace elements which can be applied to one acre of land in a calendar year.
•  Warning - The application of fertilizers containing molybdenum may result in forage crops containing levels of molybdenum which are toxic to ruminant animals

AS WITH ALL FERTILIZER PRODUCTS, KEEP OUT OF REACH OF CHILDREN AND PETS. AVOID INGESTION AND INHALATION.  DO NOT APPLY IN OR NEAR ANY PUBLIC OR PRIVATE WATER SUPPLIES INCLUDING WELLS, STREAMS OR LAKES.  DO NOT APPLY TO FLOODED OR FROZEN LAND.  STORE IN A COOL, DRY PLACE.

THIS PRODUCT MEETS THE U.S. EPA'S "EXCEPTIONAL QUALITY" STANDARDS.  FOR OTHER USES NOT LISTED ON THIS LABEL, PLEASE CONTACT YOUR DISTRIBUTOR FOR ADDITIONAL INFORMATION

Produced by:  Synagro of Texas-CDR, Inc.  City of Fort Worth, TX Village Creek WRF Biosolids Management Facility
       4500 Wilma Ln, Fort Worth, TX 76012

Guaranteed by:  Synagro of Texas-CDR, Inc. 501 Woodall Rd., Decatur, AL 35601

Bulklabeltx.fw 8/1/2022

29.     On information and belief, Synagro's biosolids fertilizers have been land applied in Bosque, Denton, Ellis, Hill, Hood, Johnson, Kaufman, Parker, Sommerville and Wise counties.

30.     Renda previously managed the City of Fort Worth's biosolids program. On information and belief, biosolids fertilizers produced, manufactured, marketed, and/or sold by Renda have been land applied in Bosque, Denton, Ellis, Hill, Hood, Johnson, Kaufman, Parker, Sommerville and Wise counties.

31.     On March 25, 2025, the Fort Worth City Council voted unanimously to cancel its ten-year contract with Synagro as of April 1, 2025, and the City of Fort Worth Water Department will take over operations and maintenance of the biosolids facility by April 5.[4]

**B.  PFAS ("Forever Chemicals") and Other Toxic Chemicals in Biosolids.**

32.     Biosolids, also known as sewage sludge, are the product of the wastewater treatment process. They are the treated organic matter derived from human sewage waste. During the wastewater treatment process, liquids are separated from the solids, and the solids are treated to remove some of the toxic ingredients and reduce pathogens.

33.     Biosolids created from treatment of wastewater are one of the most complex mixtures of chemicals that exist. This mixture of chemicals and any risk associated with those chemicals are dependent on the sources of the wastewater that are used to create the biosolids.

34.     Biosolids, when applied to agricultural land, may introduce hazardous chemicals to the soil.  These hazardous chemicals are persistent in the soil and have been observed migrating offsite (through surface runoff and/or leaching) creating hazards to nearby properties—meaning the land where it is applied is impacted as are the surrounding lands.

35.     Synagro claims biosolids "are rich in plant-available nutrients and can be applied to soil as a fertilizer or soil conditioner," and they improve soil health by providing nutrient addition, improved soil structure, and water use.[5]

---

[4] "Fort Worth ends 10-year contract with fertilizer company accused of water, land contamination," Forth Worth Report (March 25, 2025) *available at:* https://fortworthreport.org/2025/03/25/fort-worth-ends-10-year-contract-with-fertilizer-company-accused-of-water-land-contamination/ (last visited March 31, 2025).

[5] "Synagro 2022 Sustainability Report," *available at:* https://www.synagro.com/wp-content/uploads/2023/09/Synagro-Sustainability-Report-2023-Final.pdf at p. 6 (last visited Feb. 11, 2024).

36.     Nevertheless, many of the pollutants in biosolids are not removed through treatment. Further, waste treatment effluent results in chemical mixtures of several bioactive chemicals that can work additively to create risk that may not exist for each individual chemical. These chemicals enter the environment when biosolids are: 1) applied to agricultural lands, home gardens, pastures, and other lands as fertilizer; 2) landfilled; or 3) incinerated.

37.     Biosolids contain a variety of persistent and toxic pollutants, including PFAS, a large class of environmentally persistent synthetic chemicals, which then enter the water and food supply.

38.     Because PFAS are environmentally persistent, and many can leach into the groundwater, these chemicals can cause public health and environmental harm long after their release.

39.     PFAS get into biosolids in two ways. First, PFAS are ubiquitous in consumer products such as clothing, household cleaners, carpets, upholstered furniture, personal care products, and makeup. When people use these products, PFAS are washed down the drain and enter sewer systems, where they are sent to wastewater treatment plants ("WWTP"s). Second, many industries use PFAS, and their waste streams are also sent to WWTPs.

40.     While WWTPs do remove some of the chemicals in the wastewater, they do not remove PFAS. In fact, concentrations of PFAS are often higher in the effluent of WWTPs than the influent, indicating that precursor PFAS are biodegrading into new PFAS during the treatment.

41.     Virtually all biosolids-based fertilizers tested have been found to contain large amounts of PFAS.

42.    Heavy metals such as arsenic (As), mercury (Hg), selenium (Se), molybdenum (Mo), titanium (Ti), antimony (Sb), zinc (Zn), cadmium (Cd), copper (Cu), chromium (Cr),lead (Pb), and nickel (Ni) are also commonly found in biosolids.

43.    Heavy metals can accumulate in in soils over the repeated application of biosolids, and even single application events have shown to raise concentrations significantly. Metals are not biodegradable and persist in the environment after they are released. They will remain available for uptake and exposure to the plants, animals, and humans that interact with the soil, its products, and associated groundwater indefinitely.

44.    Metals exposure in humans can result in the development of nervous system disorders, gastrointestinal and kidney dysfunction, immune system dysfunction, skin lesion, birth defect, vascular damage, and cancer.

45.    Molybdenum metal is rare in nature but is present in significant quantities in industrial discharges to wastewater treatment plants and presents a serious threat when biosolids with molybdenum are land applied. Cattle and sheep are much more susceptible than other species to molybdenum toxicity, and they may show poor growth, infertility, diarrhea, lameness, ataxia, as well as osteoporosis.

46.    Estrogens and endocrine disrupters are also commonly found in biosolids, and natural and synthetic steroid estrogens are very resistent to degradation in the environment. Steroid estrogens from agriculturally applied biosolids are available to plants for uptake and accumulation in shoot and root tissue. This leads to the accumulation of steroid estrogens in agricultural products and the eventual exposure to humans and animals that consume them. In humans, lifetime external estrogen exposure has been linked to breast cancer in females and prostate cancer in males.

Evidence suggests that environmental estrogen exposure could alter the growth, development and reproduction of humans and wildlife.

47.     Pharmaceutically active compounds (*e.g.,* antimicrobials, antibiotics, non-steroidal anti-inflammatory drugs, antidepressants, antidiabetics, etc.) and their metabolites are universal in biosolids fertilizer. Pharmaceutical concentration in biosolid and sewage sludge amended soils are long lasting. They may impact ecosystem health due to their uptake by plants and animals and movement through food webs. Crops and other fresh products can introduce pharmaceutically active compounds as well as metabolites to humans. Further, the application of biosolids to agricultural fields results in the accumulation of antibiotics in soils. This can lead to the creation of antibiotic resistance bacteria in the soil. These bacteria may then pose a risk to humans and livestock.

### C. Synagro Knew or Should Have Known Its Biosolid Product Contains PFAS and Other Toxic Chemicals.

48.     Synagro touts its role in developing a circular economy—a system of production and consumption designed to reduce waste by reimagining product design, material use, and resource efficiency—by owning and operating processing facilities where Synagro processes biosolids and turns them into compost, fertilizer pellets, and soil conditioners.[6]

49.     Yet, in its 2022 Sustainability Report, Synagro acknowledges that PFAS may be present in the biosolids that Synagro sells as fertilizer: "One of our industry's challenges to move toward a more circular world, is the potential of unwanted substances in biosolids, like per- and polyfluoroalkyl substances (PFAS)."[7]

---

[6] *Id.* at pp. 6-7.
[7] *Id.* at 21. (emphasis added)

50.    In fact, Synagro explicitly recognizes that, "PFAS enter public water collection systems through discharges from industrial, commercial, and domestic sources. Each municipality has unique discharge sources and in some cases these substances can potentially be detected in biosolids."[8]

51.    In 2022, Synagro set up a nonprofit called the Coalition of Recyclers of Residual Organics by Practitioners of Sustainability at Synagro's corporate headquarters and installed its Chief Executive Officer and Chairman Bob Preston (who began his career at DuPont) as the chairman. Since its founding, the group has spent $220,000 on federal lobbying to limit liability for PFAS in biosolids according to the group's disclosure forms.

52.    On March 28, 2023, Synagro announced a joint project with CharTech Solutions to deploy high-temperature pyrolysis for PFAS mitigation of thermally dried biosolids. The press release stated: "CHAR and Synagro have been working together for three years to test and apply HTP technology for biosolids to eliminate PFAS."[9] Notably, there would be no need for Synagro to develop such technology if PFAS did not exist in biosolids. Unfortunately, thermal destruction of PFAS-containing wastes can lead to additional health and environmental harm, since PFAS have high thermal stability, and incineration may release harmful byproducts.

---

[8] *Id.*

[9] "Synagro and CharTech Solutions to Deploy High-Temperature Pyrolysis for PFAS Mitigation of Thermally Dried Biosolids," March 28, 2023, available at: https://www.synagro.com/2023/03/28/synagro-and-chartech-solutions-to-deploy-high-temperature-pyrolysis-for-pfas-mitigation-of-thermally-dried-biosolids/ (last visited Feb. 11, 2024).

53.    Further, a 2013 study of biosolids archived from 2001 showed massive quantities of PFAS in all samples.[10] Farmers in Michigan,[11] New Mexico,[12] and Maine[13] are being forced to shut down operations due to PFAS contamination. In 2022, Maine passed a law that prohibits the land application of biosolids.

54.    The United States Environmental Protection Agency ("EPA"), in its "PFAS Explained:" document available on its website, states: "**Biosolids** Fertilizer from wastewater treatment plants used on agricultural lands can affect ground and surface water."[14]

**D.  PFAS are Toxic to Humans.**

55.    As noted above, PFAS are a large family of human-made chemicals that provide heat, stain, and water resistance, making them useful for a range of commercial and industrial applications. All PFAS chemicals contain multiple bonds between atoms of carbon and fluorine, which are extremely strong and give PFAS their exceptional chemical and thermal stability. Due

---

[10] Venkatesan, AK, Halden, RU. *National inventory of perfluoroalkyl substances in archived U.S. biosolids from the 2001 EPA National Sewage Sludge Survey*. J Hazard Mater. 2013 May 15;252-253:413-8. doi: 10.1016/j.jhazmat.2013.03.016.

[11] Chris Clayton, "Forever Chemicals and Risks to Farms," *Progressive Farmer* (May 9, 2022) *available at* https://www.dtnpf.com/agriculture/web/ag/livestock/article/2022/05/06/michigan-farm-cautionary-tale-pfas (last visited Feb. 12, 2024).

[12] Steve Davies, "New Mexico dairy farmer awaits PFAS relief as Congress looks to boost research funding," *AgriPulse* (June 29, 2022) *available at* https://www.agri-pulse.com/articles/17916-new-mexico-dairy-farmer-awaits-pfas-relief-as-congress-looks-to-boost-research-funding (last visited Feb. 12, 2024).

[13] Kevin Miller, "More than 50 Maine farms impacted by PFAS, but state officials see 'glimmer of hope," *Maine Public* (Feb. 1, 2023) *available at* https://www.mainepublic.org/environment-and-outdoors/2023-02-01/more-than-50-maine-farms-impacted-by-pfas-but-state-officials-see-glimmer-of-hope (last visited Feb. 12, 2024).

[14] EPA, "PFAS Explained:" *available at* https://www.epa.gov/system/files/documents/2023-10/final-virtual-pfas-explainer-508.pdf (last visited Feb. 12, 2024).

to these strong bonds, PFAS (or in some cases, their degradation products) are highly persistent in the environment and are called "forever chemicals."

56.    Most research on the environmental fate and toxicity of PFAS has focused on the subclass of long-chain perfluoroalkyl acids ("PFAAs"), including perflurooctanoic acid ("PFOA") and perflurooctanesulfonic acid ("PFOS"), and more recently, per- and polyfluoroalkyl ether acids such as GenX chemicals.[15] There is a substantial body of scientific evidence demonstrating that wastes containing long-chain PFAAs or GenX chemicals are toxic, mobile, environmentally persistent, and bioaccumulative.

57.    In the environment, the degrees of persistence, mobility, and bioaccumulation depend on the specific PFAS compound and environmental chemistry. Shorter chain PFAS tend to be more mobile in the environment, while longer chain PFAS tend to have higher sorption. PFAS are also proteinophilic, tending to sorb to proteins in the cells of living organisms and are commonly detected at higher levels in the blood, liver, and kidney. In animals, including fish, longer chain PFAS such as PFOS tend to be more bioaccumulative, and animal tissue concentrations tend to increase as an organism's trophic level increases.

58.    PFAS are associated with cancer and are linked to growth, learning, and behavioral problems in infants and children; fertility and pregnancy problems, including pre-eclampsia; interference with natural human hormones; increased cholesterol and risk of obesity; and immune

---

[15] PFAS with six or more carbons are considered long-chain PFAS, while those with fewer than six carbons are considered short-chain. The two most-studied PFAS are eight carbon PFAS: PFOA and PFOS.

system problems.[16] Epidemiological studies have found decreased antibody response to vaccines,[17] and associations between blood serum PFAS levels and both immune system hypersensitivity and autoimmune disorders like asthma and ulcerative colitis.[18]

59.     According to EPA, "PFAS disrupt signaling of multiple biological pathways resulting in common adverse effects on several biological systems and functions, including thyroid hormone levels, lipid synthesis and metabolism, development, and immune and liver function. Additionally, EPA's examination of health effects information found that exposure through drinking water to a mixture of PFAS can be assumed to act in a dose-additive manner . . . This dose additivity means that low levels of multiple PFAS, that individually would not likely result in adverse health effects, when combined in a mixture are expected to result in adverse health effects."[19]

60.     In 1999, EPA began investigating PFOS after receiving data from 3M Company that the substance is persistent, unexpectedly toxic, and bioaccumulative. By 2000, the company entered into an agreement with EPA promising to phase out all PFOS and PFOA production. In

---

[16] U.S. Dept. of Health and Human Services, Agency for Toxic Substances and Disease Registry, *Toxicological Profile for Perfluoroalkyls*, (May 2021), *available at* https://www.atsdr.cdc.gov/toxprofiles/tp200.pdf  (last visited Feb. 12, 2024).

[17] Sunderland, E. M. et. al., *A Review of the Pathways of Human Exposure to Poly- and Perfluoroalkyl Substances (PFASs) and Present Understanding of Health Effects*, 29 JOURNAL OF EXPOSURE SCIENCE  AND ENVIRONMENTAL EPIDEMIOLOGY, no. 2, (2018), *available at* https://pubmed.ncbi.nlm.nih.gov/30470793/ (last visited Feb. 12, 2024).

[18] *See* U.S. Environmental Protection Agency, *Drinking Water Health Advisory for Perfluorooctanoic Acid (PFOA)*, 39 (May 2016), *available at* https://www.epa.gov/sites/production/files/2016-05/documents/pfoa_health_advisory_final_508.pdf (last visited Feb. 12, 2024).

[19] PFAS National Primary Drinking Water Regulation Rulemaking—Proposed Rule, 88 Fed. Reg. 18,638, 18,639 (May 30, 2023), *available at* https://www.federalregister.gov/documents/2023/03/29/2023-05471/pfas-national-primary-drinking-water-regulation-rulemaking#addresses (last visited on Feb. 12, 2024).

2006, eight other major PFAS manufacturers likewise agreed to voluntarily phase out PFOA production.

61.     As long-chain PFAAs were phased out by U.S. manufacturers, they were replaced by alternative short-chain and ether-based PFAS such as GenX chemicals, which are being found to have similar health and environmental risks as long-chain PFAAs.

62.     Numerous studies have found toxicity in legacy PFAS, such as PFOS and PFOA. Yet, as scientists study newer replacement PFAS, they are finding similar adverse toxicological outcomes in the new PFAS. A compilation of PFAS toxicity studies shows that virtually every PFAS examined is correlated with adverse health outcomes.[20]

63.     While ingestion of PFAS is the most common route of exposure, scientists are finding that inhalation and dermal absorption are important routes of exposure. The federal Agency for Toxic Substances and Disease Registry states that people working with PFAS "may be exposed to PFAS by inhaling them, getting them on their skin, and swallowing them."[21]

64.     Even small amounts of PFAS are dangerous. In March 2023, EPA issued proposed drinking water limits for six PFAS, including PFOA and PFOS. The proposed limits are 4 parts per trillion ("ppt") for both PFOA and PFOS individually, but EPA also proposed health-based, non-enforceable Maximum Contaminant Level Goals (MCLGs) of *zero* because "**there is no dose**

_____

[20] PFAS Project Lab, Northeastern University, PFAS-TOX Database, *available at* https://pfasproject.com/pfas-toxic-database/ (last visited Feb. 12, 2024).
[21] ATSDR, Per- and Polyfluoroalkyl Substances (PFAS) and Your Health, *available at* https://www.atsdr.cdc.gov/pfas/health-effects/exposure.html#:~:text=Workers%20may%20be%20exposed%20to,your%20body%20through%20your%20skin (last visited Feb. 12, 2024)

**below which either chemical is considered safe**."[22] The other four PFAS EPA proposes to regulate are GenX, PFBS, PFNA, and PFHxS.

65.    On May 8, 2024, EPA designated PFOA and PFOS, including their salts and structural isomers, as hazardous substances under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA" or "Superfund").[23] EPA found that "both PFOA and PFOS 'may present substantial danger to public health or welfare or the environment when released into the environment' when released into the environment."[24] EPA stated that, "Available information indicates that human exposure to PFOA and/or PFOS is linked to a broad range of adverse health effects, including developmental effects to fetuses during pregnancy or to infants (*e.g.,* low birth weight, accelerated puberty, skeletal variations), liver effects (*e.g.,* tissue damage), immune effects (*e.g.,* antibody production and immunity), and other effects (*e.g.,* cholesterol changes). . . In addition, toxicity assessments . . . indicated that PFOA and PFOS may cause carcinogenic effects in humans and animals."[25] EPA also concluded that "PFOA and PFOS are persistent in the environment, which can cause long-term exposure" and that they "are also highly mobile in the environment and can migrate away from the initial point of release."[26]

---

[22] PFAS National Primary Drinking Water Regulation Rulemaking—Proposed Rule, 88 Fed. Reg. 18,638,    18,639    (May    30,    2023),    *available    at* https://www.federalregister.gov/documents/2023/03/29/2023-05471/pfas-national-primary-drinking-water-regulation-rulemaking#addresses (emphasis added) (last visited on Feb. 12, 2024).
[23] Designation of Perfluorooctanoic Acid (PFOA) and Perfluorooctanesulfonic Acid (PFOS) as CERCLA Hazardous Substances, 89 Fed. Reg. 39124 (May 8, 2024) *available at* https://www.govinfo.gov/content/pkg/FR-2024-05-08/pdf/2024-08547.pdf (last visited Nov. 13, 2024)
[24] *Id.*
[25] *Id.*
[26] *Id.* at 39126.

66.     Since there is no current federal regulation of long-chain PFAAs or GenX chemicals, disposal of these PFAS wastes is largely unrestricted, and one common solution for disposal has been to release these substances into city wastewater systems. As a result, the risk of wide-spread environmental pollution and human exposure to PFAS from land application of the biosolids product that remains after wastewater treatment is high and foreseeable.

67.     There are no medical interventions that will remove PFAS from the body.

**E. PFAS biomagnifies in the food chain.**

68.     PFAS in biosolids leach into the soil or ground water, are then taken up by plants, which are subsequently consumed by humans and wildlife.

69.     In 2021, scientists published an article that predicted PFAS uptake and concentrations in different plants from biosolids and calculated the potential exposure to humans and animals consuming harvested vegetation.[27] They determined that EPA's current daily reference doses of PFOA and PFOS[28] could be met by consuming vegetables grown in biosolid amended soils.[29]

70.     Because PFAS can biomagnify,[30] PFAS from soil can be taken up by plants, which are then eaten by animals such as cows, creating contamination of both the milk and the meat.

---

[27] Lasee, S. et al, *The Effects of Soil Organic Carbon Content on Plant Uptake of Soil Perfluoro Alkyl Acids (PFAAs) and the Potential Regulatory Implications,* Environmental Toxicology and Chemistry, Vol 40(3), pp 832-845 (2021).

[28] On June 21, 2022, EPA updated its health advisories for PFOA and PFOS to 0.004 ppt for PFOA, 0.02 ppt for PFOS, 10 ppt for GenX chemicals, and 2,000 ppt for PFBS. *Lifetime Drinking Water Health Advisories for Four Perfluoroalkyl Substances*, 87 Fed. Reg. 36848. EPA's previous lifetime health advisory was 70 ppt for both PFOA and PFOS.

[29] Lasee, S. et al, *supra,* pp 832-845 (2021).

[30] Biomagnification occurs when the chemical concentration in an organism exceeds the concentration of its food where the major exposure route occurs from the organism's diet.

71.    If water is contaminated with PFAS, fish in those waters also become contaminated. Further, PFAS can lead to acute toxicity and result in death of these fish.

72.    Farms, ranches, and communities can be devastated by the subsequent contamination of water, soil, crops, fish, and livestock. This threat of contamination is not merely hypothetical – it has happened to each of the Plaintiffs in this case.

### F. Existing Federal Safety Standards and Regulations Applicable to Biosolids are Inadequate to Protect the Public from Unreasonable Risks of Injury or Damage.

73.    Since the original federal regulations on biosolids or sewage sludge were issued, the science has evolved, and the risks associated with biosolids used as fertilizers have become evident, especially with respect to PFAS.

74.    EPA recently outlined PFAS limits for drinking water, and on January 15, 2025, EPA published a draft risk assessment for potential human health and environmental risks associated with land application of sewage sludge containing PFOA and PFOS for those who live on or near impacted properties.[31] EPA concluded that unacceptable human health risks are associated with the exposure to forever chemicals via biosolids fertilizer.

75.    Specifically, EPA found land application of sewage sludge exceeds the agency's acceptable human health risk thresholds for cancer and non-cancer effects even when the sludge is applied only one time and contains only 1 part per billion of PFOA or PFOS. *Id.* at 3862.

---

[31] "Draft Sewage Sludge Risk Assessment for Perfluorooctanoic Acid (PFOA) and Perfluorooctane Sulfonic Acid (PFOS)," 90 Fed. Reg. 3859 (Jan. 15, 2025) *available at* https://www.federalregister.gov/documents/2025/01/15/2025-00734/draft-sewage-sludge-risk-assessment-for-perfluorooctanoic-acid-pfoa-and-perfluorooctane-sulfonic (last visited Jan. 23, 2025).

76.    EPA admitted its "draft risk calculations are not conservative estimates," in part because the agency modeled risk associated with sludge containing 1ppb PFOA or PFOS "which is on the low end of measured U.S. sewage sludge concentrations." *Id.* at 3863. "Risk estimates for the highest risk pathways can exceed the EPA's acceptable thresholds by several orders of magnitude." *Id.* The sludge the Plaintiffs were exposed to far exceeds the parameters modeled by EPA.

77.    EPA also issued a fact sheet for farmers recommending they, "Consider an alternative source of fertilizer from biosolids moving forward, especially if your farm might be vulnerable to PFAS impacts (examples include dairy farms where the pastures or fields used to grow feed have biosolids application, farms with pasture-raised hens or cattle in fields with biosolids application, farms growing leafy greens like lettuce or spinach, farms with a home drinking water well and sensitive groundwater, like those in regions with karst geology)."[32]

78.    As a result of safety concerns, Maine and Connecticut have banned the use of biosolids as fertilizers. Other states such as Michigan, Minnesota, New York, Vermont, and Wisconsin have enacted legislation establishing interim PFOS and PFOA criteria for biosolids. Indiana, Hawaii, Maryland, Massachusetts, New York, Oklahoma, Vermont, and Texas are currently considering new bills to ban or place additional limits on the use of biosolids fertilizers.

79.    In 2022, Michigan officials shut down a 400-acre cattle farm after biosolids were applied on that farm—and, subsequently, the meat, which was sold directly to farmers' markets and schools—tested with high levels of PFAS.

---

[32] "Draft Sewage Sludge Risk Assessment for PFOA and PFOS: Information for Farmers" (Jan. 2025) *available at* https://www.epa.gov/system/files/documents/2025-01/fact-sheet-farmers-draft-sewage-sludge-risk-assessment-pfoa-pfos.pdf (last visited Jan. 23, 2025).

80.    In 2022, Maine banned the use of sewage sludge on agricultural fields and has found contamination on at least 68 of the 100 farms the state has checked so far in a systemic effort to test farms for the chemicals, with 1,000 sites still to be tested.

81.    On December 11, 2024, Texas Attorney General Ken Paxton filed a lawsuit against chemical companies 3M and DuPont, claiming the companies knew for decade that PFAS chemicals could cause serious harm to human health yet continued to advertise them as safe for household use around families and children. Texas is suing to hold the companies accountable for deceiving Texas into buying consumer products without vital information.

82.    On February 11, 2025, Johnson County commissioners issued a state of disaster, requesting state and federal emergency funds to address farmland, livestock, and water wells contaminated by Defendants' biosolids fertilizers.

83.    On March 10, 2025, the City of Fort Worth filed a lawsuit against the U.S. Department of Defense and multiple manufacturers of PFAS chemicals to hold them accountable for contaminating Fort Worth's drinking water sources which the city admitted have been linked to serious health risks. The PFAS that the city admits is in its wastewater streams and is polluting the water supply ends up in the biosolids that Defendants' sell as safe and organic fertilizer.

84.    On March 25, 2025, the City Council of Fort Worth unanimously approved the water department's recommendation to end its 10-year contract with Synagro which began in 2019.

**G. Plaintiffs' Properties Are Polluted with PFAS and Other Deadly Contaminants.**

85.    In late November 2022, Synagro Granulite Fertilizer was left in "smoking" piles smelling like "death and sewage" at a property leased by Coy Nall; the property is located approximately 0.57 miles northeast along County Road 102 from the intersection with County

Road 204 near Grandview, Johnson County, Texas. The piles were not mixed into the soils until mid-January 2023.

86.    Plaintiffs who live, work, and own property adjacent to the Nall site, complained of the smells and reported the biosolids piles to the Texas Commission on Environmental Quality and Johnson County Constable's Office. Detective Dana Ames, Johnson County's Environmental Crimes Investigator, opened an investigation.

87.    Detective Ames obtained soil, surface water, and well water samples, and the County Commissioners' Court approved payment for their testing at a laboratory qualified to test for PFAS. The results indicate high levels of PFAS and other toxic chemicals in the soil, surface water, and well water. Thirty-two individual PFAS were found in the soil and water. All the sites tested had at least one PFAS. Moreover:

- **The drinking water well on the Alessi property tested at <u>90.9</u> ppt of PFAS.**

- **One drinking water well on the Schultz's property tested at <u>268.2</u> ppt of PFAS, and the other water well on the Schultz's property tested at <u>192.7</u> ppt of PFAS.**

- **The soils on the Plaintiffs' properties tested in the range of 97 ppt of PFAS to 6,291 ppt of PFAS.**

- **The surface water on the Plaintiffs' properties tested in the range of 84,700 ppt PFAS to <u>1,333.61</u> ppt of PFAS**.

88.    Detective Ames then obtained tissue samples from two fish and two calves (one stillborn and one that died one week after birth) from Plaintiffs' properties and had those tested. **One fish tested at <u>74,460</u> ppt of PFAS** (including 74,000 ppt of PFOS), **and the other fish tested at <u>57,000</u> ppt of PFOS.** The week-old calf tissue tested at 3,200 ppt of PFAS (including 2,400 ppt of PFOS) (the liver was not tested). The stillborn calf tissue tested at 1,490 ppt of PFAS, **while the liver of the stillborn calf tested at <u>620,228</u> ppt of PFAS** (including 610,000 of PFOS).

89.    To put these numbers in context, if a person consumed one of the fish in the pond on Plaintiffs Farmer and Alessi's property, one single serving (8 ounces) would exceed the EPA reference dose for PFOS exposure by ***30,000 times***.[33]

90.    Similarly, if a person consumed the calf liver from the calf born on Plaintiffs Schultz and Coleman's ranch, one single serving would exceed the EPA reference does for PFOS exposure by ***250,000 times***.

91.    Three of the water wells on Plaintiffs' properties that are polluted with PFAS are all cased wells drilled to about 250 feet below ground surface and draw from the Woodbine Aquifer, which is a minor aquifer located in northeast Texas. The Woodbine Aquifer provides water for municipal, industrial, domestic, livestock, and small irrigation supplies stretching across 17 counties. It overlays the Trinity Aquifer, which is a major aquifer and critical water source for millions of people in Texas.

**H.  Synagro's Granulite Fertilizer Tests Positive for PFAS.**

92.    At the grand opening of Synagro's Village Creek Biosolids Processing Facility on December 1, 2022, Synagro handed out samples of its finished biosolids product labeled Granulite ™ Fertilizer 4-4-0 (Produced @ Village Creek WRF-Fort Worth, TX). Detective Ames obtained a sample and had it tested.

93.    Synagro's biosolids product tested positive for twenty-seven individual PFAS including: 1) PFBS; 2) PFHxA; 3) PFHxS; 4) PFHpA; 5) PFOA; 6) PFOS; 7) PFNA; 8) PFDA; 9) PFUnDA; 10) PFDoDA; and 11) PFBA. All of the 11 PFAS listed have sufficient scientific

---

[33] A reference dose ("RfD") is defined as an estimate of a daily exposure to the human population (including sensitive subpopulations) that is likely to be without an appreciable risk of deleterious effects during a lifetime.

information, including concentration data, human health toxicity data, ecological toxicity data, and environmental fate and transportation data, demonstrating that they adversely affect public health and the environment. The Synagro Granulite Fertilizer sample tested with a total of 35,610 ppt PFAS and other toxic chemicals and 13,000 ppt of PFOS.

94.     Subsequent testing of Synagro's biosolids by the Office of State Chemist and by Plaintiffs tested positive for similarly high levels of PFAS as well as additional toxic chemicals.

95.     The PFAS and other toxic chemicals identified on Plaintiffs' properties are consistent with those found in Synagro's biosolids. It is important to note that different batches of biosolids have different individual PFAS, depending on the municipal and industrial inputs. In addition, PFAS are a large body of chemicals numbering more than 10,000, and laboratories may test for different suites of PFAS in a targeted analysis for PFAS in biosolids. A laboratory may test for a few PFAS compounds or as many as 70+ individual PFAS and may use different extraction methods. Further, there are many precursors to PFAS in the biosolids, which may transform into other PFAS. Therefore, the species of PFAS found in the biosolids may be different than the PFAS found on a site where biosolids were applied. Moreover, the laboratory tests are capturing only a fraction of the PFAS in the samples, and no other possible sources of the contamination on Plaintiffs' properties have been identified.

**I.     Prior to Synagro, Renda Managed the City of Fort Worth's Biosolids Program.**

96.     Biosolids from the City of Fort Worth were previously managed by Renda. These Renda biosolids were applied to lands adjacent to Plaintiffs' properties by the same neighboring farmer. Renda continues to produce and market biosolids for land application in Johnson County and the surrounding counties.

97.     Similar to Synagro, Renda touts "years of experience processing excellent quality biosolids" and beneficial reuse of the biosolids "to aid local farmers and ranchers" and for the "betterment of society." Yet, Renda, like Synagro, knew or should have known that its biosolid product contained PFAS and other toxic chemicals.

### J.  Impact on Plaintiffs

*Plaintiffs Farmer and Alessi*

98.     Since Mr. Nall's application of the Synagro Granulite Fertilizer on his leased pastureland in November 2022 which has polluted the soil, surface water, and drinking water on Plaintiffs' property, Plaintiffs James Farmer and Robin Alessi have suffered medical issues that may be linked to PFAS exposure, including high blood pressure, respiratory and cardiac issues, generalized pain, and skin irritations.

99.     Mr. Farmer and Ms. Alessi have many farm and household pets that have recently died including dogs, horses, a newborn bull calf, fish in their stock ponds (catfish, perch, bass, and minnow), peacocks, ducks, chickens, guineas, and cranes. Their cats and dogs appear to be suffering from new medical issues. All the animals drink well water or pond water directly, and they graze off the pastures and eat hay grown on the property.

100.    Mr. Farmer and Ms. Alessi have grown a vegetable garden every year and relied on the produce as food, which they can no longer do.

101.    Now that their property and only water source is polluted with "forever chemicals," they face the stark possibility of having to abandon the home they love and the property they have developed into a working ranch, raising cattle, freshwater fish, and game birds, which may have to be euthanized since they cannot be safely consumed.

102.    Mr. Farmer and Ms. Alessi have started to purchase bottled water for drinking and cooking, but they must shower, do dishes, clean the house, and water their animals with well water which is polluted.

103.    Their property is their main asset which has been rendered worthless and will be costly and difficult to clean up and restore.

**Plaintiffs Schultz and Coleman**

104.    Since Mr. Nall's application of the Synagro Granulite Fertilizer on his leased pastureland in November 2022 which has polluted the soil, surface water, and drinking water on Plaintiffs' property, Plaintiffs Karen Coleman and Tony Coleman have suffered medical issues that may be linked to PFAS exposure. In August 2023, Mrs. Coleman suffered from a mass on her thoracic spine: a bone lesion and mass with severe compression of her spinal canal that presents a high risk of paralysis. She has continued intermittent pain that radiates around her left rib cage and weakness in her left hip and required insulin after the surgery. She now is being monitored for pre-diabetes. Mr. Coleman never suffered any medical issues until recently when he contracted an upper respiratory virus which continued to worsen for a lengthy period of time.

105.    The Colemans lease Mrs. Schultz's property to raise cattle for hay production and, since the biosolids application in November 2022, many heifers, calves, and a bull have died.

106.    The liver of the stillborn calf that died in December 2023 tested with 610,000 ppt of PFOS. Because the calf was stillborn, all the PFOS in the calf's body was from the mother cow (*e.g.,* the placenta and mother's blood). To put the PFOS level in perspective, Maine issued a consumption advisory for beef with PFOS with an action level of 3,400 ppt of PFOS for children

and 7,300 ppt of PFOS for adults.[34] In addition, Michigan requires a farm to shut down and issued a consumption advisory when beef from cattle tested between 980 to 2800 ppt of PFOS.[35] The PFOS level found in the Plaintiffs' stillborn calf exceeded those levels by magnitudes of hundreds.

107.    Now that Mrs. Schultz's property and only water source are polluted with "forever chemicals," she and the Colemans (her daughter and son-in-law) face the stark possibility of having to abandon the home they love and the property they have developed into a working cattle ranch. They are suffering significant daily economic losses due to the inability to market their cattle or beef or hay and may have to euthanize their entire herd, a crushing and emotional task.

108.    Mrs. Schultz and the Colemans have purchased and installed water filters for the house have purchased bottled water for drinking and cooking, but they must shower, do dishes, clean the house, and water their animals with well water which is polluted.

109.    Mrs. Schultz's property is her main asset which has been rendered worthless and will be costly and difficult to clean up and restore. She had intended for her daughter and son-in-law to inherit the property they visit and work on daily. The Colemans have lost income and may have to completely shut down the business they have worked so hard to build.

### *Plaintiffs Alton and Christopher Bryant*

110.    Alton Bryant is the owner of property impacted by Defendants. Both Mr. Bryant, and his son Christopher Bryant, reside on the property. As with the other Plaintiffs named herein,

---

[34] Maine Action Levels for PFOS in beef for use in determining whether beef at a farm is adulterated (Aug. 4, 2000) *available at* https://www.maine.gov/dep/spills/topics/pfas/PFOS-Action-Levels-for-Beef-Derivation-Memo-08.04.20.pdf (last visited Feb. 14, 2024).
[35] Garrett Ellison, "Advisory warns of PFAS in beef from Michigan cattle farm," *MLive* (Jan. 28, 2022) *available at* https://www.mlive.com/public-interest/2022/01/advisory-warns-of-pfas-in-beef-from-michigan-cattle-farm.html (last visited Feb. 14, 204).

the property has been in the family and was intended to stay within the family. The property is one of their main assets, has been rendered worthless and will be costly and difficult to clean up and restore.

## CLASS ACTION ALLEGATIONS

111.    Plaintiffs bring this action on behalf of themselves and on behalf of all others similarly situated pursuant to Federal Rule of Civil Procedure 23. The "Class" includes:

> All individuals who, from 2018 to date, are or were owners of real property and/or personal agricultural property to include livestock and dairy cattle, located in Bosque, Denton, Ellis, Hill, Hood, Johnson, Kaufman, Parker, Sommerville and/or Wise counties and who as a result of Defendants' biosolids have suffered a diminution in value of their property.

112.    Excluded from the Class are Defendants' officers and directors, and any entity in which Defendants have a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of the Defendants. Excluded also from the Class are Members of the judiciary to whom this case is assigned, their families, and Members of their staff. Also excluded from the Class are claims for damages for personal injury.

113.    Plaintiffs reserve the right to amend the class definition set forth above if discovery and/or further investigation reveals that the Class should be expanded, divided into subclasses, or modified in any way.

114.    The definition of the Class is unambiguous. Plaintiffs are members of the Class they seek to represent.

### *Fed. R. Civ. P. 23(a) Prerequisites*

115.    **Numerosity:** The members of the Class are so numerous that joinder is impractical. The Defendants have sold between 6.5 million and 16 million pounds of biosolids during the applicable years to farmers and ranchers within Bosque, Denton, Ellis, Hill, Hood, Johnson,

Kaufman, Parker, Sommerville and/or Wise counties. As such, the Class consists of thousands of members, the identify of whom is within the knowledge of and can be ascertained by resort to Defendants' records.

116.    **Existence and Predominance of Common Questions of Law and Fact:** Rule 23(a)(2) is satisfied in that Plaintiffs' claims raise questions of law or fact common to the questions of law or fact raised by the claims of each of the Class members. Further, Rule 23(a)(3) is satisfied in that these common questions of law or fact predominate over those affecting only individual class members. These common questions of law and fact include, without limitation:

    a.    Whether Defendants owed a duty to Plaintiffs and members of the Class to refrain from acts and/or omissions reasonably likely to result in PFAS or other toxic pollutant contamination of real and/or personal agricultural property;

    b.    Whether Defendants knew, foresaw, anticipated and/or should have known, anticipated, and/or foreseen that it was unreasonably dangerous to engage in acts and/or omissions that resulted in PFAS or other toxic pollutant contamination of real and/or personal agricultural property;

    c.    Whether Defendants knew, foresaw, anticipated and/or should have known, anticipated, and/or foreseen that their acts and/or omissions were likely to result in Plaintiffs and members of the Class having PFAS or other toxic pollutant contamination of real and/or personal agricultural property;

    d.    Whether Defendants' acts and/or omissions proximately caused Plaintiffs and members of the Class having PFAS or other toxic pollutant contamination of real and/or personal agricultural property;

e.  Whether the Plaintiffs and members of the Class having PFAS or other toxic pollutant contamination of real and/or personal agricultural property is injurious, offensive and/or otherwise harmful to Plaintiffs and the members of the Class; and

f.  Whether Defendants' conduct resulted in irreparable harm to Plaintiffs and the member of the Class; and

g.  Whether Defendants' conduct warrants injunctive and/or declaratory relief.

117.  **Typicality:** The claims of Plaintiffs are typical of the claims of the Class in that they, like all class members, were subjected to the same challenged conduct. Plaintiffs, like all class members, have been damaged by Defendants' biosolids-based fertilizers. Furthermore, the factual basis of Defendants' misconduct is common to all class members and represents a common thread of unfair and unconscionable conduct resulting in injury to all members of the Class.

118.  **Adequacy of representation:** Plaintiffs are committed to the vigorous prosecution of this action and have retained competent counsel experienced in the prosecution of class actions and, in particular, class actions on behalf of those injured by PFAS or other toxic pollutants. Such class counsel will act zealously on behalf of the Class.  Plaintiffs have no conflicts of interest with the Class, have suffered the same type of losses as the Class and have the ability to play an active role in this litigation Accordingly, Plaintiffs are adequate representatives and will fairly and adequately protect the interests of the Class.

*Fed. R. Civ. P. 23 (b) Factors*

119.  **Superiority:** A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class

Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy.

120.    Even if class members themselves could afford such individual litigation, the court system could not. Given the complex legal and factual issues involved, individualized litigation would significantly increase the delay and expense to all parties and to the Court. Individualized litigation would also create the potential for inconsistent or contradictory rulings. By contrast, a class action presents far fewer management difficulties, allows claims to be heard which might otherwise go unheard because of the relative expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale and comprehensive supervision by a single court.

121.    Defendants have acted on grounds that apply generally to the Class as a whole, so that class certification, injunctive relief, and any monetary relief are appropriate on a class-wide basis.

122.    **Notice to the Classes:** Notice can be accomplished by direct mailing for most, if not all, class members based on Defendants' records and, if necessary, can be complemented by publication in news sources and town hall meetings.

123.    The claims asserted herein are applicable to all individuals who, from 2018 to date, are or were owners of real property and/or personal agricultural property to include livestock and dairy cattle, located in Bosque, Denton, Ellis, Hill, Hood, Johnson, Kaufman, Parker, Sommerville and/or Wise counties and who as a result of Defendants' biosolids have suffered a diminution in value of their property.

124.    All conditions precedent to bringing this action have been satisfied and/or waived.

## EQUITABLE TOLLING OF APPLICABLE STATUTE OF LIMITATIONS

125.    Plaintiffs incorporate each of the foregoing allegations as if fully stated herein.

126.    To the extent there is any question as to the timeline of the filing of this action, the running of any statute of limitations has been tolled by reason of Defendants' fraudulent concealment. Defendants, through affirmative misrepresentations and omissions, actively concealed from Plaintiffs the true risks associated with their biosolids fertilizers.

127.    At all times relevant, Defendants have maintained that their biosolids fertilizers are safe, organic, and non-toxic. Further, Synagro lobbied Congress and state legislatures including the Texas legislature to limit regulation of biosolids, despite knowing the risks to health and the environment the product presents.

128.    As a result of Defendants' actions, Plaintiffs were unaware and could not reasonably have known or have learned through reasonable diligence, that the biosolids fertilizers exposed their property to the risks alleged herein and that those risks were the direct and proximate result of Defendants' actions and omissions.

129.    Furthermore, Defendants are estopped from relying on any statute of limitations because of its fraudulent concealment of the true character, quality, and nature of their biosolids fertilizers because this was non-public information over which Defendants had and continues to have exclusive control, and because Defendants knew that this information was not available to Plaintiffs. In addition, Defendants are estopped from relying on any statute of limitations because of their intentional concealment of these facts.

130.    Plaintiffs had no knowledge that Defendants were engaged in the wrongdoing alleged herein. Because of the fraudulent acts of concealment of wrongdoing by Defendants, Plaintiffs could not have reasonably discovered the wrongdoing at any time prior. Also, the economics of this fraud should be considered. Defendants had the ability to and did spend enormous amounts of money in furtherance of its purpose of marketing, promoting and/or

distributing a profitable fertilizer, notwithstanding the known or reasonably known risks. Plaintiffs could not have afforded and could not have possibly conducted studies to determine the nature, extent, and identity of related risks to health and the environment and were forced to rely on only the Defendants' representations. Accordingly, Defendants are precluded by the discovery rule and/or the doctrine of fraudulent concealment from relying upon any statute of limitations.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### NEGLIGENCE
**(On behalf of Plaintiffs and the Class)**

131.    Plaintiffs incorporate each of the foregoing allegations as if fully stated herein.

132.    Defendants had a legal duty to exercise reasonable care in the design, research, testing, manufacture, formulation, handling, control, disposal, supply, promotion, marketing, distribution, sale, testing, labeling, use, and provision of product information and instructions for use of their respective biosolids fertilizers, including a duty to assure that the product would not cause unreasonable risk of injury for its intended and foreseeable uses.

133.    Defendants failed to exercise ordinary care in the design, research, testing, manufacture, formulation, handling, control, disposal, supply, promotion, marketing, distribution, sale, testing, labeling, use, and provision of product information and instructions for use of their respective biosolids fertilizers in that Defendants knew or should have known that their respective biosolids fertilizers created a high risk of unreasonable, dangerous effects, including but not limited to, livestock illness and death and long-lasting pollution of water and soil with persistent toxic and cancer-causing chemicals including PFAS, which are difficult if not impossible to remediate, thereby reducing the market value of their property.

134.    Defendants so negligently, carelessly, and recklessly designed, researched, tested, manufactured, formulated, handled, controlled, disposed, supplied, promoted, marketed, distributed, sold, tested, labeled, used, and provided product information and instructions for use of their respective biosolids fertilizers that they breached their duties and each directly and proximately caused Plaintiffs' properties including their drinking water wells to be polluted with persistent toxic and cancer-causing chemicals including PFAS, resulting in livestock illness and death and loss of market value of their property.

135.    The negligence by Defendants, their agents, servants, and/or employees, included but was not limited to the following acts and/or omissions:

   a.  Manufacturing, producing, promoting, formulating, creating, and/or designing their respective biosolids fertilizers without thoroughly testing them;

   b.  Failing to test their respective biosolids fertilizers and/or failing to adequately, sufficiently, and properly test their biosolids fertilizers to determine the presence and concentration of PFAS and other toxic chemicals (including heavy metals, estrogens/endocrine receptors, and pharmaceuticals);

   c.  Failing to conduct reasonable, appropriate, or adequate scientific studies to evaluate the environmental fate and transport characteristics of PFAS and other toxic chemicals (including heavy metals, estrogens/endocrine receptors, and pharmaceuticals) in their respective biosolids fertilizers such as runoff and drainage assessments, including the likelihood that the use and disposal of their respective biosolids fertilizers would cause PFAS and other toxic chemicals (including heavy metals, estrogens/endocrine receptors, and pharmaceuticals) to pollute properties and water supplies, render drinking water unusable and unsafe, and threaten public health and welfare and the environment;

   d.  Failing to take any action to prevent their respective biosolids fertilizers from polluting adjacent or nearby properties from land application sites;

   e.  Failing to adequately and correctly warn the public, users of biosolids, agricultural professionals, Plaintiffs, EPA, TCEQ, and the Texas Office of the State Chemist of the dangers of Defendants' respective biosolids fertilizers including the potential for migration from land application sites;

   f.  Failing to provide EPA, TCEQ, and the Texas Office of the State Chemist with adequate and accurate information regarding the chemical constituents in

Defendants' respective biosolids fertilizers and the risk to vegetation, crops, livestock, water supplies, and health and the environment posed by the use and disposal of biosolids fertilizers, especially in sensitive areas where people live off the products grown on or near land where biosolids are applied or near drinking water supplies and water bodies;

g.  Marketing, advertising, selling, and recommending the use of their respective biosolids fertilizers without sufficient knowledge as to its dangerous propensities;

h.  Representing that their respective biosolids fertilizers were safe for use for their intended purpose, including claiming they are organic and that the use of biosolids will "protect the health of our water, our Earth and those who depend upon them now and for the future"[36] when, in fact, their biosolids fertilizers were unsafe and contain chemicals not found in nature including PFAS;

i.  Representing that their respective biosolids fertilizers had equivalent safety and efficacy as other forms of fertilizers;

j.  Designing, manufacturing, producing, and formulating their respective biosolids fertilizers in a manner which was dangerous to those who live on or near where the biosolids fertilizers were land applied (including livestock) or use products grown from land on or near where the biosolids fertilizers were land applied;

k.  Failing to use ordinary care in designing, manufacturing, producing, and formulating their respective biosolids fertilizers so as to avoid the aforementioned risks to health and the environment when the fertilizers were used as intended;

l.  Concealing information from users of biosolids, agricultural professionals, Plaintiffs, EPA, TCEQ, and the Texas Office of the State Chemist while knowing that Defendants' respective biosolids fertilizers were unsafe, dangerous, and/or non-conforming with EPA and Texas regulations;

m.  Concealing and/or misrepresenting information from users of biosolids, agricultural professionals, Plaintiffs, EPA, TCEQ, and the Texas Office of the State Chemist, concerning the severity of risk and dangers of Defendants' respective biosolids fertilizers compared to other forms of fertilizers;

n.  Selling their respective biosolids fertilizers with a false and misleading label;

---

[36] "Synagro—Your Partner for a Cleaner, Greener World," *available at* https://www.synagro.com (last visited April 1, 2025).

o.  Failing to accompany their respective biosolids fertilizers with adequate warnings regarding the risks to soil, vegetation, drinking water supplies, water bodies, human health, livestock, and the environment; and

p.  By acting in an otherwise careless and/or negligent manner.

136.    Defendants knew or should have known that those who live on or near properties or use products grown on or near properties where the Defendants' biosolids fertilizers were land applied would foreseeably suffer injury because of Defendants' failure to exercise ordinary care, as set forth above.

137.    Defendants' violations of law and/or negligence were the proximate cause of Plaintiffs' injuries, harm and economic loss, which Plaintiffs have suffered and continue to suffer.

138.    Plaintiffs have suffered actual injury or loss. As a direct and proximate result of Defendants' acts and omissions alleged in this Complaint:

a.  Plaintiffs' land water supplies were and continue to be polluted with PFAS and other toxic chemicals (including heavy metals, estrogens/endocrine receptors, and pharmaceuticals);

b.  Plaintiffs were exposed to PFAS and other toxic chemicals (including heavy metals, estrogens/endocrine receptors, and pharmaceuticals) through their ordinary use of polluted water for drinking, cooking, bathing, and cleaning;

c.  Plaintiffs' livestock were exposed to PFAS and other toxic chemicals (including heavy metals, estrogens/endocrine receptors, and pharmaceuticals) and have suffered illness and death;

d.  Plaintiffs' properties were and continue to be polluted with PFAS and other toxic chemicals (including heavy metals, estrogens/endocrine receptors, and pharmaceuticals) which will be costly to remediate (if even possible), thereby reducing their market value;

e.  Plaintiffs have incurred, are incurring, and will incur, substantial costs for investigation, remediation, cleanup, restoration, removal, treatment, and monitoring of their soil and water and for veterinary treatment and expenses related to the illness and death of their livestock;

f.  Plaintiffs have lost income and incurred substantial expenses because they cannot market their livestock, which have been exposed to with PFAS and other toxic chemicals (including heavy metals, estrogens/endocrine receptors, and pharmaceuticals) and tested positive for the same.

139.    As a further direct and proximate result of the acts and omissions of the Defendants alleged in this Complaint, Plaintiffs have sustained and will sustain other substantial expenses and damages, in an amount within the jurisdictional limits of this Court for which Defendants are strictly, jointly, and severally liable.

140.    Existing federal safety standards and regulations applicable to biosolids fertilizers are inadequate to protect the public from unreasonable risks of injury or damage.

141.    Defendants knew it was substantially certain that the acts and omissions described above would threaten public health and cause extensive pollution of property and drinking water supplies. Defendants committed each of the above-described acts and omissions with conscious or deliberate disregard of the foreseeable harm resulting from the defective product. Such conduct was not the result of mistake of fact or law, honest error or judgment, overzealousness, mere negligence, or other human failing, but was a bad faith decision to market and promote sales of biosolids fertilizer, knowing of the defect and danger, in conscious or deliberate disregard of the threat to the safety of Plaintiffs. Therefore, Plaintiffs request an award of exemplary and punitive damages in an amount reasonable, appropriate, and sufficient to punish these Defendants and deter them from ever committing the same or similar acts.

142.    WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this Court deems just and proper.

143.    Plaintiffs further seek a mandatory injunction requiring (1) a site investigation resulting in full vertical and horizontal delineation of impacted soils, groundwater, and surface

water on Plaintiffs' properties, and (2) cleanup and restoration of the Plaintiffs' properties that results, at a minimum, in the complete removal of chemical constituents released to Plaintiffs' properties, no impact to surface or groundwater on Plaintiffs' properties, and Plaintiffs' land returned to the condition prior to any pollution or contamination.

## SECOND CAUSE OF ACTION

## STRICT PRODUCTS LIABILITY—DESIGN DEFECT
### (On Behalf of Plaintiffs and the Class)

144.    Plaintiffs incorporate each of the foregoing allegations as if fully stated herein.

145.    At all times herein mentioned, Defendants designed, researched, tested, manufactured, formulated, handled, controlled, disposed, supplied, promoted, marketed, distributed, sold, tested, labeled, used, and provided product information and instructions for use of their respective biosolids fertilizers that were land applied near Plaintiffs' properties.

146.    Defendants' respective biosolids fertilizers were defective because they contain PFAS and other toxic chemicals (including heavy metals, estrogens/endocrine disrupters, and pharmaceuticals) in levels that exceed acceptable risk thresholds to human health and the environment and cause illness and death in both humans and livestock.

147.    Defendants' biosolids fertilizers were defective when they left the Defendants' hands.

148.    Defendants' biosolids fertilizers reached the consumer in the same condition that it was in when it left the manufacturer's custody. The biosolids fertilizers were expected to and did reach users such as Coy Nall without substantial change in its condition in which it was produced, manufactured, sold, distributed, and marketed by the Defendants.

149.    Defendants' respective biosolids fertilizers were defective in design and/or formulation, in that, when they left the hands of the Defendants' manufacturer and/or supplier, the

foreseeable risks exceeded the benefits associated with the design or formulation of the biosolids fertilizers.

150.    Defendants' respective biosolids fertilizers were defective in design and/or formulation, in that, when they left the hands of the Defendants' manufacturer and/or supplier, it was unreasonably dangerous, unreasonably dangerous in normal use, and it was more dangerous than an ordinary consumer would expect.

151.    At all times herein mentioned, Defendants' respective biosolids fertilizers were in a defective condition and unsafe, and Defendants knew or had reason to know that said product was defective and unsafe, especially when used in the form and manner as provided by Defendants. Defendants' respective biosolid fertilizers were defective in the following ways:

    a.    When placed in the stream of commerce, Defendants' biosolids fertilizers were defective in design and formulation and, consequently, dangerous to an extent beyond that which an ordinary consumer would anticipate.

    b.    When placed in the stream of commerce, Defendants' biosolids fertilizers contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated manner.

    c.    Defendants did not sufficiently test, investigate, or study its biosolids fertilizers.

    d.    Exposure to the pollutants in Defendants' biosolids fertilizers presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the fertilizers.

    e.    Defendants knew or should have known at the time of marketing its biosolids fertilizers that exposure to the fertilizers could result in cancer and other severe illnesses in humans and livestock and presented an unreasonable risk to health and the environment.

    f.    Defendants did not conduct adequate post-marketing surveillance of its biosolids fertilizers.

    g.    Defendants' biosolids fertilizers contain high levels of PFAS, which:

        i.    are persistent in the environment and resist degradation;

    ii.  are mobile in the environment;

    iii.  cause extensive groundwater contamination when used and disposed of in a foreseeable and intended manner;

    iv.  render drinking water unsuitable for human use and consumption, even at extremely low levels;

    v.  pose significant threats to the public health and welfare and the environment because exposure can lead to adverse health effects, including high cholesterol, changes in liver enzymes, decreased immune response to vaccination, thyroid disorders, pregnancy-induced hypertension and preeclampsia, and cancer (testicular and kidney for PFOA, liver and thyroid for PFOS) and may cause livestock illness and death;

    vi.  and certain PFAS compounds biodegrade to other more harmful PFAS compounds.

h.  Defendants' biosolids fertilizers also contain other toxic chemicals (including heavy metals, estrogens/endocrine disrupters, and pharmaceuticals) that remain after the wastewater treatment process and cause illness and death.

i.  Defendants' biosolids fertilizers violated the applicable federal requirements found at 40 CFR Part 503 and the applicable state requirements found at 30 Tex. Admin. Code Chapter 312.

j.  Defendants' biosolids fertilizers violated the provisions of the Texas Commercial Fertilizer Control Act, Chapter 63.142(a).

152.    Defendants knew or should have known that at all times mentioned herein their respective biosolids fertilizers were in a defective condition and were and are inherently unsafe.

153.    Plaintiffs and their properties were exposed to Defendants' respective biosolids fertilizers without knowledge of the fertilizers' dangerous characteristics.

154.    At the time the Defendants' respective biosolids fertilizers were land applied near Plaintiffs' properties, the fertilizers were being used for the purposes and in a manner normally intended, as a fertilizer.

155.    Defendants with this knowledge voluntarily designed and formulated their respective biosolids fertilizers with a dangerous condition for use by the public and for land application by Coy Nall near Plaintiffs' properties.

156.    Defendants had a duty to create a product that was not unreasonably dangerous for its normal, intended use.

157.    Defendants created a product that was and is unreasonably dangerous for its normal, intended use.

158.    Defendants marketed and promoted a product in such a manner to make it inherently defective as the marketing and promotion downplayed the product's suspected, probable, and established risks to health and the environment inherent with its normal, intended use.

159.    Defendants designed, researched, tested, manufactured, formulated, supplied, promoted, marketed, distributed, sold, and labeled a defective product, which created an unreasonable danger to health and the environment, and Defendants are therefore strictly liable for the injuries and damages sustained by Plaintiffs.

160.    Plaintiffs could not, by the exercise of reasonable care, have discovered the biosolids fertilizer defects herein mentioned or perceived its danger.

161.    A safer alternative design to Defendants' biosolids was available, including the following:

    a.  <u>Manure</u>: Manure is a more appropriate fertilizer for sustained agriculture than biosolids because manure provides a moderate, sustained source of nitrogen for plants, while nitrogen in biosolids exists primarily in a mineralize form leading to quick, short-lived supply of nitrogen to plants.

    b.  <u>Organic Compost</u>: Made from plant materials and animal manure, organic compost provides nutrients without the risk of chemical contamination.

c.  Biofertilizers: Microbial inoculants can enhance soil fertility naturally.

d.  Chemical Fertilizers: Chemical Fertilizers provide similar growth outcomes (plant height, plant diameter, or dry weight yield) in crops such as wheat, sugar cane, and corn, without the same risks from biosolids.

e.  Pretreatment: Defendants could have required pretreatment from dischargers into the wastewater treatment plant to remove the PFAS from the sources, which would not have increased costs for Defendants.

f.  Treatment of the Biosolids: Defendants could have used chelators to bind or remove heavy metals from the biosolids.

162.   A safer design such as those set forth above would have prevented or significantly reduced the risk of injury or damage without limiting the utility of the product.

163.   A safer design alternative such as those set forth above was economically feasible at the time the product was released.

164.   Defects in Defendants' respective biosolids fertilizers were the cause or a substantial factor in causing Plaintiffs' injuries and damages.

165.   Plaintiffs have suffered actual injury or loss. As a direct and proximate result of Defendants' defective design of their respective biosolids fertilizers alleged in this Complaint:

a.  Plaintiffs' land water supplies were and continue to be polluted with PFAS and other toxic chemicals (including heavy metals, estrogens/endocrine receptors, and pharmaceuticals);

b.  Plaintiffs were exposed to PFAS and other toxic chemicals (including heavy metals, estrogens/endocrine receptors, and pharmaceuticals) through their ordinary use of polluted water for drinking, cooking, bathing, and cleaning;

c.  Plaintiffs' livestock were exposed to PFAS and other toxic chemicals (including heavy metals, estrogens/endocrine receptors, and pharmaceuticals) and have suffered illness and death;

d.  Plaintiffs' properties were and continue to be polluted with PFAS and other toxic chemicals (including heavy metals, estrogens/endocrine receptors, and pharmaceuticals) which will be costly to remediate (if even possible), thereby reducing their market value;

e.  Plaintiffs have incurred, are incurring, and will incur, substantial costs for investigation, remediation, cleanup, restoration, removal, treatment, and monitoring of their soil and water and for veterinary treatment and expenses related to the illness and death of their livestock;

f.  Plaintiffs have lost income and incurred substantial expenses because they cannot market their livestock, which have been exposed to with PFAS and other toxic chemicals (including heavy metals, estrogens/endocrine receptors, and pharmaceuticals) and tested positive for the same.

166.  As a result of the defect in Defendants' respective biosolids fertilizers, Plaintiffs' have suffered property harm including the loss of market value of their land, livestock illness and death, related expenses, and lost income.

167.  Existing federal safety standards and regulations applicable to biosolids fertilizers are inadequate to protect the public from unreasonable risks of injury or damage.

168.  Defendants' defective design of their respective biosolids fertilizers amount to willful, wanton, and/or reckless conduct by Defendants.

169.  Defendants knew that it was substantially certain that the acts and omissions described above would threaten public health and cause extensive pollution of property and drinking water supplies. Defendants committed each of the above-described acts and omissions with conscious or deliberate disregard of the foreseeable harm resulting from the defective product. Such conduct was not the result of mistake of fact or law, honest error or judgment, overzealousness, mere negligence, or other human failing, but was a bad faith decision to market and promote sales of biosolids fertilizer, knowing of the defect and danger, in conscious or deliberate disregard of the threat to the safety of Plaintiffs.

170.  WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this court deems just and proper.

171.    Plaintiffs further seek a mandatory injunction requiring (1) a site investigation resulting in full vertical and horizontal delineation of impacted soils, groundwater, and surface water on Plaintiffs' properties, and (2) cleanup and restoration of the Plaintiffs' properties that results, at a minimum, in the complete removal of chemical constituents released to Plaintiffs' properties, no impact to surface or groundwater on Plaintiffs' properties, and Plaintiffs' land returned to the condition prior to any pollution or contamination.

### THIRD CAUSE OF ACTION

### STRICT PRODUCTS LIABILITY—FAILURE TO WARN
**(On Behalf of Plaintiffs and the Class)**

172.    Plaintiffs incorporate each of the foregoing allegations as if fully stated herein.

173.    Defendants have engaged in the business of selling, testing, distributing, supplying, manufacturing, marketing, and/or promoting their respective biosolids fertilizers, and through that conduct have knowingly and intentionally placed their respective biosolids fertilizers into the stream of commerce with full knowledge that it reaches consumers such as Coy Nall who land applied it near Plaintiffs' properties and exposed Plaintiffs and their property to the fertilizers through ordinary and reasonably foreseeable uses.

174.    Defendants did in fact sell, distribute, supply, manufacture, and/or promote biosolids fertilizers to the public, and Defendants' biosolids fertilizers reached the consumer in the same condition that it was in when it left the manufacturer's custody. The biosolids fertilizers were expected to and did reach users such as Coy Nall without substantial change in the condition of the product from when Defendants initially distributed it.

175.    At the time of manufacture, Defendants' respective biosolids fertilizers were defective and unsafe in manufacture such that it was unreasonably dangerous those living on or

near impacted sites (*i.e.,* where biosolids are land applied) or those that rely primarily on their products (*e.g.,* food crops, animal products, drinking water) and was so at the time Defendants distributed it and at the time Plaintiffs and their property were exposed to it. The defective condition of the biosolids fertilizers was due in part to the fact that they were not accompanied by proper instructions and warnings regarding their carcinogenic and toxic qualities, fate and transport after land application, and possible side effects, including, but not limited to livestock illness and death and long-lasting soil and water pollution with PFAS and other toxic chemicals (including heavy metals, estrogens/endocrine receptors, and pharmaceuticals).

176.    Defendants' respective biosolids fertilizers did not contain instructions or caution or warning statement adequate to protect health and the environment for those living on or near impacted sites (*i.e.,* where biosolids are land applied) or those that rely primarily on their products (*e.g.,* food crops, animal products, drinking water).

177.    Defendants' respective biosolids fertilizers did not contain proper instructions or adequate caution or warning statements as required by 40 U.S.C. § 503.14(e).

178.    Defendants could have amended the label of their respective biosolids fertilizers to provide additional instructions and warnings.

179.    This defect caused serious injury to Plaintiffs who live near a land application site where Coy Nall used the product in its intended and foreseeable manner.

180.    At all times herein mentioned, Defendants had a duty to properly design, manufacture, formulate, test, inspect, package, label, distribute, market, examine, maintain supply, provide proper warnings, and take such steps to assure that the product did not cause those who living on or near impacted sites (*i.e.,* where biosolids are land applied) or those that rely primarily

on their products ( *e.g.,* food crops, animal products, drinking water) to suffer from unreasonable and dangerous side effects.

181.    Defendants labeled, distributed, marketed, and promoted the aforesaid product such that it was dangerous and unsafe for the use and purpose for which it was intended.

182.    Defendants failed to provide instructions and warn of the nature and scope of the side effects associated with their respective biosolids fertilizers, namely that they contain PFAS and other toxic chemicals (including heavy metals, estrogens/endocrine disrupters, and pharmaceuticals) in levels that exceed acceptable risk thresholds to human health and the environment and cause illness and death in both humans and livestock. These side effects were known or reasonably scientifically knowable at the time of distribution.

183.    Defendants were aware of the probable consequences of the aforesaid conduct. Despite the fact that Defendants knew or should have known that their respective biosolids fertilizers caused serious injuries to those who live on or near impacted sites (*i.e.,* where biosolids are land applied) or those that rely primarily on their products ( *e.g.,* food crops, animal products, drinking water), Defendants failed to exercise reasonable care to include instructions or warn of the dangerous properties of their fertilizers. Defendants willfully and deliberately failed to avoid the consequences of their own failure to warn, and in doing so, Defendants acted with conscious disregard for the safety of Plaintiffs and their property.

184.    At the time that Plaintiffs and their property were exposed to Defendants' biosolids fertilizers, Plaintiffs could not have reasonably discovered any defect in the fertilizers prior through the exercise of reasonable care.

185.    Defendants, as the manufacturers and/or distributors of the subject product, are held to the level of knowledge of an expert in the field.

186.    Plaintiffs and users such as Coy Nall reasonably relied upon the skill, superior knowledge, and judgment of the Defendants.

187.    Had Defendants properly disclosed the risks associated with their respective biosolids fertilizers, Plaintiffs would have avoided the risk of exposure to themselves and their property. Farmers like Coy Nall would have been properly informed such that he did not use the product or used it in a way to avoid runoff to his neighbors. Plaintiffs would have taken all possible affirmative action to prevent runoff of the biosolids fertilizer to their property. Further, as a result of Plaintiffs having publicized the risks associated with Defendants' biosolids fertilizers, EPA has issued a draft risk assessment to form the basis for regulation of PFOA and PFOS in sludge and has recommended farmers consider using a different fertilizer and test their water, the Texas legislature is considering legislation to regulate PFAS in biosolids, and the City of Fort Worth has ended its contract with Defendant Synagro for managing the biosolids program.

188.    The information that Defendants did provide or communicate failed to contain adequate instructions, warnings, and precautions that would have enabled users like Coy Nall and similarly situated individuals to utilize the product safely and for those who live on or near impacted sites (*i.e.,* where biosolids are land applied) or those that rely primarily on their products (*e.g.,* food crops, animal products, drinking water) to take necessary precautions. Instead, Defendants disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries associated with the use of and/or exposure to their respective biosolids fertilizers; continued to promote the efficacy and "organic" nature of biosolids, even after they knew of should have known of the unreasonable risks from use and exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing, promotion, and lobbying efforts, any

information or research about the risks and dangers of exposure to Defendants' respective biosolids fertilizers.

189.    To this day, Defendants have failed to adequately warn of the true risks of Plaintiffs' injuries associated with the use and exposure of biosolids and contend Plaintiffs' claims are novel and unproven, despite EPA's published draft risk assessment which corroborates them.

190.    As a result of the inadequate instructions and warnings, Defendants' respective biosolids fertilizers were defective and unreasonably dangerous when they left the possession and/or control of Defendants, were distributed by Defendants, and used by Plaintiffs' neighbor Coy Nall.

191.    As a direct and proximate result of Defendants' actions as alleged herein, and in such other ways to be later shown, the subject product caused Plaintiffs to sustain injuries.

192.    As a direct and proximate result of Defendants' defective design of their respective biosolids fertilizers alleged in this Complaint:

   a.  Plaintiffs' land water supplies were and continue to be polluted with PFAS and other toxic chemicals (including heavy metals, estrogens/endocrine receptors, and pharmaceuticals);

   b.  Plaintiffs were exposed to PFAS and other toxic chemicals (including heavy metals, estrogens/endocrine receptors, and pharmaceuticals) through their ordinary use of polluted water for drinking, cooking, bathing, and cleaning;

   c.  Plaintiffs' livestock were exposed to PFAS and other toxic chemicals (including heavy metals, estrogens/endocrine receptors, and pharmaceuticals) and have suffered illness and death;

   d.  Plaintiffs' properties were and continue to be polluted with PFAS and other toxic chemicals (including heavy metals, estrogens/endocrine receptors, and pharmaceuticals) which will be costly to remediate (if even possible), thereby reducing their market value;

   e.  Plaintiffs have incurred, are incurring, and will incur, substantial costs for investigation, remediation, cleanup, restoration, removal, treatment, and

monitoring of their soil and water and for veterinary treatment and expenses related to the illness and death of their livestock;

f.  Plaintiffs have lost income and incurred substantial expenses because they cannot market their livestock, which have been exposed to with PFAS and other toxic chemicals (including heavy metals, estrogens/endocrine receptors, and pharmaceuticals) and tested positive for the same.

193.    As a result of the defect in Defendants' respective biosolids fertilizers, Plaintiffs' have suffered property harm including the loss of market value of their land, livestock illness and death, related expenses, and lost income.

194.    Existing federal safety standards and regulations applicable to biosolids fertilizers are inadequate to protect the public from unreasonable risks of injury or damage.

195.    Defendants knew that it was substantially certain that the acts and omissions described above would threaten public health and cause extensive pollution of property and drinking water supplies. Defendants committed each of the above-described acts and omissions with conscious or deliberate disregard of the foreseeable harm resulting from the defective product. Such conduct was not the result of mistake of fact or law, honest error or judgment, overzealousness, mere negligence, or other human failing, but was a bad faith decision to market and promote sales of biosolids fertilizer, knowing of the defect and danger, in conscious or deliberate disregard of the threat to the safety of Plaintiffs.

196.    WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all relief as this court deems just and proper.

197.    Plaintiffs further seek a mandatory injunction requiring (1) a site investigation resulting in full vertical and horizontal delineation of impacted soils, groundwater, and surface water on Plaintiffs' properties, and (2) cleanup and restoration of the Plaintiffs' properties that

results, at a minimum, in the complete removal of chemical constituents released to Plaintiffs' properties, no impact to surface or groundwater on Plaintiffs' properties, and Plaintiffs' land returned to the condition prior to any pollution or contamination.

## DAMAGES

198.    Defendants' conduct as alleged hereinabove, was a direct, proximately, and producing cause of Plaintiffs' injuries, which resulted in the following damages:

    **a.**  Loss of market value for property, including livestock;

    **b.**  Cost of repairs;

    **c.**  Diminution in market value after repair, including stigma damages;

    **d.**  Expenses;

    **e.**  Lost income;

    **f.**  Exemplary damages for the wanton, willful, fraudulent, and reckless acts and omissions of the Defendants which demonstrate a complete disregard and reckless indifference for the safety and welfare of the general public and to Plaintiffs in an amount sufficient to punish Defendants and deter future similar conduct, to the extent allowable by applicable law; and

    **g.**  Court costs.

## PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Plaintiffs, individually and on behalf of the Class, pray for judgment against the Defendants for the following:

    a.  An Order certifying this action as a class action and appointing Plaintiffs and their counsel to represent the Class;

    b.  Actual, special, and consequential damages;

c.  Mandatory injunction requiring (1) a site investigation resulting in full vertical and horizontal delineation of impacted soils, groundwater, and surface water on Plaintiffs' properties and (2) cleanup and restoration of the Plaintiffs' properties that results, at a minimum, in the complete removal of chemical constituents released to Plaintiffs' properties, no impact to surface or groundwater on Plaintiffs' properties, and the Plaintiffs' land returned to the condition prior to any pollution or contamination.

d.  Exemplary damages;

e.  Prejudgment and postjudgment interest;

f.  Court costs;

g.  Attorneys' fees; and

h.  All other relief to which Plaintiffs are entitled.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs hereby demand trial by jury as to all issues.

DATE:  April 4, 2025                    Respectfully submitted,

**DURHAM, PITTARD, & SPALDING, LLP**
*(Local Counsel)*

By:   */s/ Kirk Pittard*
        Kirk Pittard
        Texas Bar No. 24010313
        Tammy Holt
        Texas Bar No. 00796771
        Shannon Turner Hays
        Texas Bar No. 24028086
        P.O. Box 224626
        Dallas, TX 75222
        (214) 946-8000 phone
        (214) 946-8433 fax
        kpittard@dpslawgroup.com
        tholt@dpslawgroup.com
        shays@dpslawgroup.com

**GUERRERO & WHITTLE, PLLC**

By:   _/s/ Mary Whittle_____
　　　　　Mary Whittle
　　　　　Texas Bar No. 24033336
　　　　　Mark Guerrero
　　　　　Texas Bar No. 24032377
　　　　　2905 San Gabriel Street, Suite 309
　　　　　Austin, TX 78705
　　　　　(512) 605-2300 phone
　　　　　(512) 222-5280 fax
　　　　　mark@gwjustice.com
　　　　　mary@gwjustice.com

**NAPOLI SHKOLNIK, PLLC**

　　　　　Christopher L. Schnieders
　　　　　_admitted pro hac vice_
　　　　　6731 W. 121st Street, Suite 201
　　　　　Overland Park, KS 66209
　　　　　(913) 246-3860 phone
　　　　　(913) 312-5841 fax
　　　　　cschnieders@napolilaw.com

　　　　　Patrick N. Haines
　　　　　Texas Bar No. 00784191
　　　　　3001 Esperanza Crossing #1065
　　　　　Austin, TX 78758
　　　　　(212) 397-1000 phone
　　　　　phaines@napolilaw.com

**NSPR LAW SERVICES, LLC**

　　　　　Paul J. Napoli
　　　　　_admitted pro hac vice_
　　　　　1302 Avenida Ponce de León
　　　　　Santurce, PR 00907
　　　　　(833) 271-4502 phone
　　　　　pnapoli@nsprlaw.com

　　　　　_**ATTORNEYS FOR PLAINTIFFS**_

## <u>CERTIFICATE OF SERVICE</u>

   I hereby certify that a true and correct copy of the above and foregoing document has been electronically served on all parties and/or their counsel of record via CM/ECF on April 4, 2025.

        */s/ Kirk Pittard*    

Christian Ellis       *Via CM/ECF: christian@bondsellis.com*
John T. Wilson, IV     *Via CM/ECF: john.wilson@bondsellis.com*
Patrick D. Sheridan     *Via CM/ECF: patrick.sheridan@bondsellis.com*
Paul Harrison Farmer, Jr.   *Via CM/ECF: paul.farmer@bondsellis.com*
**BONDS ELLIS EPPICH**
**SCHAFER JONES LLP**
420 Throckmorton Street, Suite 1000
Fort Worth, TX 76102-3727

J. Amber Ahmed      *Via CM/ECF: aahmed@bdlaw.com*
Collin S. Gannon      *Via CM/ECF: cgannon@bdlaw.com*
James B. Slaughter     *Via CM/ECF: jslaughter@bdlaw.com*
**BEVERIDGE & DIAMOND P.C.**
400 West 15th Street, Suite 1410
Austin, Texas 78701

Matthew S. Parish     *Via CM/ECF: mparish@tsplaw.com*
John P. Abbey      *Via CM/ECF: jabbey@tsplaw.com*
**TAUNTON, SNYDER & PARISH, P.C.**
777 N Eldridge Pkwy, Suite 450
Houston, TX 77079
Direct: 713.993.2342

Gregory N. Ziegler     *Via CM/ECF: gziegler@zgblaw.com*
**ZIEGLER GARDNER BELL, PLLC**
901 Main Street, Suite 4960
Dallas, Texas 75202