**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| ROBIN ALESSI, et al., | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | |
| *v.* | ) | **Civil Action No. 3:25-cv-00445-K** |
| | ) | |
| SYNAGRO TECHNOLOGIES, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**[PROPOSED] BRIEF FOR CITY OF FORT WORTH, TRINITY RIVER AUTHORITY,
AND CITY OF AUSTIN AS AMICUS CURIAE**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES................................................................................................ ii

IDENTITY AND INTERESTS OF AMICUS CURIAE ............................................. 1

STATEMENT OF THE CASE.......................................................................................... 2

ARGUMENT ....................................................................................................................... 3

   I.    Governmental immunity is critical to biosolids management ........................... 3

      A.   Political subdivisions are required to manage biosolids as a core governmental function. ......................................................................................................................... 4

      B.   The underlying science, regulatory requirements, and best practices for managing contaminants in biosolids are still being developed ............................................. 5

      C.   Publicly owned treatment works are passive receivers of PFAS contamination and should not be held liable for the conduct of industry. ........................................... 7

   II.    Political subdivisions have enumerated immunity for biosolids ....................... 8

      A.   The Texas Legislature has defined governmental immunity and limited its waiver ...... 9

      B.   Biosolids operations are governmental functions within the scope of "sanitary and storm sewers," "waterworks," and "water and sewer service. ........................... 10

   III.  The *Wasson* factors do not apply in tort cases or where the Texas Legislature has enumerated a function as governmental in Tex. Civ. Prac. & Rem. Code § 101.0215 ............. 12

   CONCLUSION ..................................................................................................................... 13

# TABLE OF AUTHORITIES

## Cases

*City of Galveston v. State*, 217 S.W.3d 466 (Tex. 2007)..............................................8, 11

*City of Houston v. Downstream Env't, L.L.C.*, 444 S.W.3d 24 (Tex. App.—Houston [14th Dist.] 2014, pet. denied)..................................................................... 10

*City of Houston v. Petroleum Traders Corp.*, 261 S.W.3d 350 (Tex. App.—Houston [14th Dist.] 2008, no pet.) ....................................................................................11

*City of Plano v. Homoky*, 294 S.W.3d 809 (Tex. App.—Dallas 2009, no pet.) ............................11

*City of San Antonio v. Butler*, 131 S.W.3d 170 (Tex. App.—San Antonio 2004, pet. denied) ......11

*City of Tyler v. Likes*, 962 S.W.2d 489 (Tex. 1997) ...................................................... 8

*Del Rio v. City of Austin*, 706 S.W.3d 698 (Tex. App.—Austin 2025, pet. filed) ..................11, 12

*Dilley v. City of Houston*, 222 S.W.2d 992 (Tex. 1949)................................................ 8

*Doe v. City of Fort Worth*, 646 S.W.3d 889 (Tex. App.—Fort Worth 2022, no pet.).................... 12

*Ethio Exp. Shuttle Serv., Inc. v. City of Houston*, 164 S.W.3d 751 (Tex. App.—Houston [14th Dist.] 2005, no pet.) ........................................................................ 9

*Hays St. Bridge Restoration Grp. v. City of San Antonio*, 570 S.W.3d 697 (Tex. 2019) ............. 12

*Hidalgo Cnty. Water Improvement Dist. No. 3 v. Hidalgo Cnty. Irrigation Dist. No. 1*, 669 S.W.3d 178, 182 (Tex. 2023)..................................................................... 9

*Hux v. S. Methodist Univ.*, 819 F.3d 776 (5th Cir. 2016) ............................................ 13

*McDonald v. City of the Colony*, No. 2-08-263-CV, 2009 WL 1815648, at *5 (Tex. App.—Fort Worth June 25, 2009, no pet.) ............................................................ 10

*Reata Const. Corp. v. City of Dallas*, 197 S.W.3d 371 (Tex. 2006) ................................. 4

*Rogers v. City of Houston*, 627 S.W.3d 777 (Tex. App.—Houston [14th Dist.] 2021, no pet.) 9, 12

*Rosenberg Dev. Corp. v. Imperial Performing Arts, Inc.*, 571 S.W.3d 738 (Tex. 2019)................ 3

*Ryder Integrated Logistics, Inc. v. Fayette County*, 53 S.W.3d 922 (Tex. 2015)........................ 10

*Tex. Nat. Res. Conservation Comm'n v. IT-Davy*, 74 S.W.3d 849, 853–54 (Tex. 2002) ............... 9

*Tooke v. City of Mexia*, 197 S.W.3d 325 (Tex. 2006)................................................... 9

*Town of Highland Park v. McCullers*, 646 S.W.3d 578 (Tex. App.—Dallas 2025, no pet.)......... 13

*Travis Cent. Appraisal Dist. v. Norman*, 342 S.W.3d 54 (Tex. 2011)............................... 9

*Triple BB, LLC v. Village of Briarcliff* 566 S.W.3d 385 (Tex. App.—Austin 2018, pet. denied). ...............................................................................10,11

*Wasson Interests, Ltd. v. City of Jacksonville*, 559 S.W.3d 142 (Tex. 2018) ................................ 12

*Wilson v. Tex. Parks and Wildlife Dept.*, 8 S.W.3d 634 (Tex. 1999)............................................ 10

## Statutes

An Act To Prevent the Further Contamination of the Soils and Waters of the State with So-called Forever Chemicals, Maine P.L. 2021, ch. 641, § 2 ................................................ 6

TEX. CIV. PRAC. & REM. CODE § 101.0215(a)(9), (11), (32) ............................................. 8, 9, 12

TEX. WATER CODE § 51.149(e) ............................................................................ 9

**Regulations**

30 TEX. ADMIN. CODE § 312.11(a) ........................................................................... 4, 5

## IDENTITY AND INTERESTS OF AMICUS CURIAE

The City of Fort Worth, Texas ("Fort Worth"); the Trinity River Authority ("TRA"); and the City of Austin, Texas ("Austin") (together, "Amici") are political subdivisions in Texas that operate wastewater treatment facilities and manage resulting sewage sludge and biosolids as a public service (generally, "biosolids operations" or "biosolids management").[1] Their interest in this case is preserving, as an enumerated governmental function, statutory governmental immunity for political subdivisions that perform such essential services.

Fort Worth is a municipality in Texas that operates the Village Creek Water Reclamation Facility, a wastewater treatment plant that serves most of Fort Worth and twenty-three other communities at a capacity of up to 166 million gallons per day. The biosolids from this facility are processed into a Class A dried pellet, which is used by customers including farmers, ranchers, golf courses, and others. The Class A dried pellets produced from Fort Worth's biosolids are the product at issue in Plaintiffs' Second Amended Complaint (Doc. No. 36).

TRA is a conservation and reclamation district in Texas and the largest wholesale provider of wastewater treatment services in the State. TRA operates five regional wastewater collection and treatment facilities in North Texas, treating up to 233.5 million gallons of wastewater per day from forty-one wholesale municipal and district customers and serving a total population of over

---

[1] The terms "biosolids" and "sewage sludge" are often used interchangeably by the public and in lay documents. The U.S. Environmental Protection Agency ("EPA"), other regulatory agencies, and waste management professionals typically distinguish between them, using "'biosolids' to mean sewage sludge that has been treated to meet the requirements in the EPA's regulation entitled, 'Standards for the Use or Disposal of Sewage Sludge,' promulgated at 40 C.F.R. Part 503, and intended to be applied to land as a soil conditioner or fertilizer." EPA, *Basic Information about Sewage Sludge and Biosolids*, https://www.epa.gov/biosolids/basic-information-about-sewage-sludge-and-biosolids (last visited July 7, 2025). Because the distinction is not essential to the points that Amici seek to make in this brief, and in the interest of simplicity, the terms are at times used interchangeably herein.

two million Texans. The biosolids produced by TRA's Central Regional Wastewater System plant are land-applied with specially designed spreading equipment for local farmers as fertilizer.

Austin is a municipality that operates two wastewater treatment plants, with a combined capacity of up to 150 million gallons of wastewater per day, as well as one biosolids management plant. Austin's Hornsby Bend Biosolids Management Plant treats the leftover wastewater sludge from Austin's wastewater treatment plants, converting biosolids into an EPA-certified soil conditioner called "Dillo Dirt."

## STATEMENT OF THE CASE

In this case, Plaintiffs bring individual and class negligence and product liability claims against Defendants Synagro Technologies, Inc. and Synagro of Texas-CDR, Inc. (together, "Synagro") and Renda Environmental, Inc. ("Renda") for conduct relating to "biosolids fertilizers containing PFAS and other toxic chemicals (including heavy metals, estrogens/endocrine disrupters, and pharmaceuticals)." Doc. No. 36 ¶ 2. Fort Worth previously contracted with Synagro and Renda to manage the City's biosolids program, which included dewatering biosolids and selling the dried fertilizer to customers for land application. *Id.* ¶¶ 26, 28, 30, 31.

Synagro and Renda have each moved to dismiss this case. Doc. Nos. 43, 45. They assert, among other things, that they are entitled to derivative governmental immunity because they were "acting as the [City]'s agent" when making biosolids available for beneficial reuse. Doc. No. 43 at 19–22 (citation omitted); Doc. No. 45 at 14–18 (citation omitted). The premise of this argument is that "Fort Worth has immunity for any harm caused by its biosolids," and that contractors such as Defendants therefore have derivative immunity. Doc. No. 43 at 19; Doc. No. 45 at 14. Plaintiffs opposed, arguing in relevant part that Fort Worth lacks governmental immunity for biosolids management. Doc. No. 49 at 13–16; Doc. No. 50 at 13–16. Plaintiffs also argued that derivative immunity did not apply for other reasons. Doc. No. 49 at 16–22 (arguing Fort Worth did not control

Synagro); Doc. No. 50 at 16–21 (arguing same as to Renda). Subsequently, Defendants each filed replies addressing Fort Worth's governmental immunity as to biosolids. Doc. No. 51 at 2–5; Doc. No. 52 at 2–5.

Amici write to support the governmental immunity of political subdivisions in Texas with respect to biosolids operations. Governmental immunity for these activities matters from practical and public policy standpoints because governmental entities charged with performing these operations are passive receivers with limited control over the contents of sewage discharged to wastewater treatment plants, yet are required by state and local laws to manage that sewage. Moreover, case law not addressed by the parties demonstrates that biosolids operations are enumerated governmental functions protected by governmental immunity.

## ARGUMENT

### I.    Governmental immunity is critical to biosolids management.

Governmental immunity for political subdivisions is an "extension of sovereign immunity." *Rosenberg Dev. Corp. v. Imperial Performing Arts, Inc.*, 571 S.W.3d 738, 741 (Tex. 2019). The justifications for immunity are "political, pecuniary, and pragmatic." *Id.* at 740. "Among other benefits, sovereign immunity maintains equilibrium among the branches of government by honoring the allocation of responsibility for resolving disputes with the state." *Id.* (internal quotation marks omitted). "The immunity doctrine also protects the public coffers by deferring to the Legislature's policy decisions about when to allow tax resources to be shifted away from their intended purposes toward defending lawsuits and paying judgments." *Id.* at 740–41 (internal quotation marks omitted). The Texas Legislature has defined certain governmental functions as protected by governmental immunity in a non-exclusive list, including numerous functions that encompass biosolids operations. *See infra* Part II.

3

**A. Political subdivisions are required to manage biosolids as a core governmental function.**

Governmental immunity for government subdivisions related to biosolids operations is critically important for a number of reasons. Without it, a core governmental function would be subject to liability, contrary to Amici's understanding of the Texas Legislature's intent, and governmental entities' ability to serve their residents would be impeded by "requiring tax resources to be used for defending lawsuits and paying judgments rather than using those resources for their intended purposes." *Reata Const. Corp. v. City of Dallas*, 197 S.W.3d 371, 375 (Tex. 2006) (citation omitted). Wastewater plants necessarily generate sludge as a byproduct. According to EPA, about "3.76 million dry metric tons . . . of sewage sludge is generated each year." EPA, *Draft Sewage Sludge Risk Assessment for Perfluorooctanoic Acid (PFOA) CASRN 335-67-1 and Perfluorooctane Sulfonic Acid (PFOS), CASRN 1763-23-1* at iii (Jan. 14, 2025). As a practical matter, municipalities and other entities that operate wastewater treatment plants must remove this sludge from their plants in some fashion. *Id.* Indeed, publicly owned treatment works ("POTWs") are required by the State of Texas to remove sewage sludge from their plants, whether through land application, incineration, landfilling, or surface disposal.[2]

Nationwide, as of 2022, "approximately 56% of sewage sludge generated by . . . POTWs was land applied, 24% was landfilled, 3% was disposed of in a sewage sludge monofill, 16% was incinerated, and 1% was disposed of using another method." *Id.* Land-applied biosolids have become an important substitute for increasingly expensive chemical fertilizers. EPA, *Biosolids*

---

[2] 30 Texas Admin Code § 312.11(a) (requiring a permit for land application, processing, storage, disposal, or incineration of biosolids); *see also* Texas Commission on Environmental Quality ("TCEQ"), *Biosolids from Sludge: What Are They and How Are They Used?* (last visited June 24, 2025), https://www.tceq.texas.gov/permitting/wastewater/sludge/sludge-explained (stating that "[d]omestic wastewater treatment plants…must dispose of the sewage sludge generated by the treatment process" and describing various options); *see also* EPA, *Draft Sewage Sludge Risk Assessment, supra* at vii.

*Technology Fact Sheet Land Application of Biosolids* at 1 (Sept. 2000); Department of Agriculture, *Access to Fertilizer: Competition and Supply Chain Concerns*, 87 Fed. Reg. 15191, 15192 (Mar. 17, 2022) (discussing rising chemical fertilizer costs). In Texas, as of 2018, approximately forty-four percent of biosolids were land-applied, forty-six percent were landfilled, and ten percent were surface-disposed. National Biosolids Data Project, *Texas Biosolids*, https://www.biosolidsdata.org/texas (last accessed June 27, 2025). A permit from TCEQ is required before processing, land-applying, or disposing of biosolids or sewage sludge in any other way. 30 Texas Admin Code § 312.11(a); *see also* TCEQ, *Sewage Sludge and Biosolids: Permits for Land Application, Processing, or Disposal*, https://www.tceq.texas.gov/permitting/wastewater/sludge/WQ_sludge_ClassB_forms.html (last visited June 27, 2025).

### B. The underlying science, regulatory requirements, and best practices for managing contaminants in biosolids are still being developed.

Recently, regulatory attention has turned to the presence of chemicals such as PFAS in biosolids. EPA is evaluating "the potential human health and environmental risks associated with land application, surface disposal, and incineration of sewage sludge that contains" PFAS. EPA, *Draft Sewage Sludge Risk Assessment*, *supra* at iii; *see also* EPA, Standards for the Use or Disposal of Sewage Sludge, 58 Fed. Reg. 9248 (Feb. 19, 1993) (codified at 40 C.F.R. pt. 503) (existing standards for biosolids, setting limits only for certain metals). This evaluation is ongoing. EPA recently included on its PFAS agenda: "Finish public comment period for biosolids risk assessment and determine path forward based on comments." EPA, *Administrator Zeldin Announces Major EPA Actions to Combat PFAS Contamination* (Apr. 28, 2025), https://www.epa.gov/newsreleases/administrator-zeldin-announces-major-epa-actions-combat-pfas-contamination. The Texas Legislature also recently considered bills that would have imposed

5

limits on PFAS in biosolid fertilizers but ultimately let these expire without action. H.B. 1674, 89th Legislature, Reg. Sess. (Tex. 2025); S.B. 886, 89th Legislature, Reg. Sess. (Tex. 2025).

Putting aside whether regulatory limits for PFAS or other contaminants in biosolids are necessary or will ultimately be established, the best ways to destroy or sequester PFAS in impacted materials are also still being studied. EPA has acknowledged that more research is needed to evaluate the optimal ways to destroy or dispose of PFAS-contaminated materials. EPA, *Interim Guidance on the Destruction and Disposal of PFAS and Materials Containing PFAS—Version 2* at 2 (Apr. 8, 2024) ("[I]t is important to note that real-world performance and testing data are generally limited. Additional performance and testing data . . . may change EPA's understanding of each technology's ability to control PFAS."). EPA recently committed to "[p]rovide more frequent updates to the PFAS Destruction and Disposal Guidance—changing from every three years to annually—as EPA continues to assess the effectiveness of available treatment technologies." EPA, *Administrator Zeldin Announces Major EPA Actions*, *supra*. As to biosolids specifically, it is still up for debate what methods POTWs should use to manage biosolids. On one side of the spectrum, Maine elected to ban land-application of biosolids in 2022. An Act To Prevent the Further Contamination of the Soils and Waters of the State with So-called Forever Chemicals, Maine P.L. 2021, ch. 641, § 2 (codified as amended at Me. Rev. Stat. Ann. tit. 38, § 1304(20)). Consultants retained by Maine to evaluate the impacts of that ban and best practices for biosolids management considered in a broader context explained that, post-ban, "[v]irtually overnight, biosolids management costs for many POTWs doubled, which caused severe and unexpected strains on public utility budgets" and on in-state landfill capacity, which "is estimated to be fully used by 2028." Brown and Caldwell, *An Evaluation of Biosolids Management in Maine and Recommendations for the Future - Prepared for the Maine Department of Environmental*

6

*Protection* at 1–3 (Dec. 15, 2023) (recommending, as a result, "that the State Legislature consider reevaluating the ban on land application").

### C. Publicly owned treatment works are passive receivers of PFAS contamination and should not be held liable for the conduct of industry.

In addition to the still-developing science on potential health and environmental impacts of PFAS in biosolids and best practices for destroying or disposing of PFAS-impacted materials, it bears emphasis that POTWs are passive receivers. They are not responsible for and cannot feasibly prevent the use of PFAS or other contaminants that make their way into POTWs, even though they have an obligation to accept sewage from domestic sources and treat and manage that sewage. It would be inequitable to nevertheless hold POTWs liable for harms they cannot control—particularly when they are complying with all state and federal laws governing biosolids management. For this reason, EPA recently reaffirmed the "polluter pays" principle underlying major federal environmental hazardous waste laws, and committed to working with Congress and industry to protect "passive receivers" like POTWs from PFAS liability. EPA, *Administrator Zeldin Announces Major EPA Actions*, *supra* (stating EPA's intent to "engage with Congress and industry to establish a clear liability framework that ensures the polluter pays and passive receivers are protected"); *see also* Water Systems PFAS Liability Protection Act, H.R. 1267, 119th Congress (2025) (bill pending before House Transportation and Infrastructure Committee that would exempt public water systems, POTWs, municipalities operating stormwater systems, political subdivisions and special districts acting as wholesale water agencies, and associated contractors from liability under the Comprehensive Environmental Response, Compensation, and Liability Act for releases of PFAS); Water Systems PFAS Liability Protection Act, H.R. 7944, 118th Congress (2024) (same, in prior Congress).

The legislative history of the Texas Tort Claims Act ("TTCA") evinces that the Texas Legislature views governmental operations such as those at issue here as purveying a public good. At common law, "the construction and operation of a sewer system, or systems of storm sewers" was not thought to be "a strictly governmental function." *Dilley v. City of Houston*, 222 S.W.2d 992, 993 (Tex. 1949) (internal quotation marks omitted), *superseded by statute as noted in, City of Tyler v. Likes*, 962 S.W.2d 489, 503 (Tex. 1997). But a 1987 amendment of the Texas Constitution, Tex. Const. art. XI, § 13, "empower[ed] the Legislature to abrogate common law rights of action against municipalities," *City of Tyler*, 962 S.W.2d at 503, and the Texas Legislature exercised that power in amending the TTCA that year to specifically enumerate "sanitary and storm sewers," "waterworks," and "water and sewer service" as governmental functions entitled to immunity. Tex. Civ. Prac. & Rem. Code § 101.0215(a)(9), (11), (32); *see also infra* Part II. Accepting Plaintiffs' argument that political subdivisions lack immunity as to biosolids management, a necessary component of operating a wastewater treatment plant, would contravene the Texas Legislature's intent in its 1987 amendments to the TTCA and unjustifiably increase costs for ratepayers. Amici respectfully submit that the Court should decline to do so, and instead reaffirm longstanding principles of government immunity under Texas law. *City of Galveston v. State*, 217 S.W.3d 466, 469 (Tex. 2007) ("Th[e] heavy presumption in favor of immunity arises not just from separation-of-powers principles but from practical concerns. In a world with increasingly complex webs of government units, the Legislature is better suited to make the distinctions, exceptions, and limitations that different situations require.").

## II.    Political subdivisions have enumerated immunity for biosolids operations.

The Texas Legislature has deemed "sanitary and storm sewers," "waterworks," and "water and sewer service" as governmental functions entitled to immunity. As a result, biosolids

operations are entitled to governmental immunity. *Rogers v. City of Houston*, 627 S.W.3d 777, 795 (Tex. App.—Houston [14th Dist.] 2021, no pet.) (citations omitted).

### A.  The Texas Legislature has defined governmental immunity and limited its waiver.

Under Texas law, governmental immunity provides protection from suit and liability for political subdivisions of the state, such as cities, river authorities, and water districts. *Travis Cent. Appraisal Dist. v. Norman*, 342 S.W.3d 54, 57–58 (Tex. 2011); *Hidalgo Cnty. Water Improvement Dist. No. 3 v. Hidalgo Cnty. Irrigation Dist. No. 1*, 669 S.W.3d 178, 182 (Tex. 2023); Tex. Water Code § 51.149(e). Governmental immunity only applies to functions that are considered "governmental," as opposed to "proprietary." *Tooke v. City of Mexia*, 197 S.W.3d 325, 343 (Tex. 2006). "Proprietary functions are those conducted 'in its private capacity, for the benefit only of those within its corporate limits, and not as an arm of the government,' while . . . governmental functions are [those] 'in the performance of purely governmental matters solely for the public benefit.'" *Id.* (citations omitted). The Texas Legislature has defined governmental functions to include: (1) "sanitary and storm sewers"; (2) "waterworks"; and (3) "water and sewer service." Tex. Civ. Prac. & Rem. Code § 101.0215(a)(9), (11), (32). "If a function is included in the nonexclusive list of governmental functions, it has been deemed governmental in nature by the legislature and [courts] have no discretion or authority to hold otherwise." *Rogers*, 627 S.W.3d at 795 (citations omitted).

The Texas Legislature may waive immunity by statute or legislative resolution. *Tex. Nat. Res. Conservation Comm'n v. IT-Davy*, 74 S.W.3d 849, 853–54 (Tex. 2002). The TTCA creates a limited waiver of governmental immunity for narrowly defined tort claims. Tex. Civ. Prac. & Rem. Code § 101.021. However, the TTCA waiver of immunity is not relevant to the biosolids operations described in the Second Amended Complaint, and the waiver has also been significantly limited in scope by Texas courts. *Ethio Exp. Shuttle Serv., Inc. v. City of Houston*, 164 S.W.3d 751, 757

(Tex. App.—Houston [14th Dist.] 2005, no pet.) ("Sovereign immunity is waived under the [TTCA] for only two types of claims: . . . those involving [(1)] property damage, personal injury or death arising from the operation or use of a motor-driven vehicle or motor-driven equipment; and (2) . . . personal injury or death caused by a condition or use of tangible personal property or real property."); *see also Ryder Integrated Logistics, Inc. v. Fayette County*, 53 S.W.3d 922, 927 (Tex. 2015) (describing "Legislature's preference for a limited immunity waiver" and "strictly constru[ing] section 101.021's vehicle-use requirement"); *Wilson v. Tex. Parks and Wildlife Dep't*, 8 S.W.3d 634, 635 (Tex. 1999) ("[A] plaintiff must prove that the [governmental entity] possessed—that is owned, occupied, or controlled—the premises where injury occurred.").

### B. Biosolids operations are governmental functions within the scope of "sanitary and storm sewers," "waterworks," and "water and sewer service."

Defendants have pointed the Court to several helpful decisions demonstrating that biosolids operations are governmental functions within the scope of certain items on the Texas Legislature's list of defined governmental functions. *See generally* Doc. No. 43 at 20; Doc. No. 45 at 15. However, additional cases meriting examination demonstrate that biosolids operations are governmental functions. *See, e.g.*, *McDonald v. City of the Colony*, No. 2-08-263-CV, 2009 WL 1815648, at *5 (Tex. App.—Fort Worth June 25, 2009, no pet.) (tort claims for city's raw sewage lift station that harmed plaintiff lessor's property involved "water and sewer services" enumerated governmental function and city was therefore immune absent waiver); *City of Houston v. Downstream Env't, L.L.C.*, 444 S.W.3d 24, 35 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) ("[The] City's actions in plugging the discharge line between [industrial] facility and the City's sewer system involved a governmental function for which the City has immunity.").

In particular, in *Triple BB, LLC v. Village of Briarcliff*, the plaintiff argued that "a contract for upgrading the capabilities of a water treatment plant is not one for providing water and sewer

10

service but rather concerns the maintenance of a public utility." 566 S.W.3d 385, 393 (Tex. App.—Austin 2018, pet. denied). In rejecting the argument, the Austin Court of Appeals found that "the water treatment facility and the raw water lines that supply it are essential parts of the [municipality's] provision of water and sewer service." *Id.* at 393–94. The plaintiff "'may not split various aspects of [the municipality's] operation into discrete functions and recharacterize certain of those functions as proprietary.'" *Id.* at 394 (citing *City of Plano v. Homoky*, 294 S.W.3d 809, 815 (Tex. App.—Dallas 2009, no pet.) (quoting *City of San Antonio v. Butler*, 131 S.W.3d 170, 178 (Tex. App.—San Antonio 2004, pet. denied)). Here, Plaintiffs attempt to do the very thing the *Triple BB* court proscribed, by mischaracterizing the land application of biosolids as proprietary because "other Texas cities do not choose to hire contractors to turn their sewage sludge in [*sic*] biosolids fertilizers and market them." Doc. No. 49 at 15; Doc. No. 50 at 15.

Sludge is an unavoidable byproduct of the wastewater treatment process, and governmental entities are required by the State to manage it in some way. *See supra* Part I. Governmental entities do not lose the immunity afforded to them by the Legislature because they choose one method over another. *See Del Rio v. City of Austin*, 706 S.W.3d 698, 707 (Tex. App.—Austin 2025, pet. filed) ("[A] municipality has discretion as to how it exercises a governmental function, and neither that discretion nor the municipality's motive for engaging in an activity can convert a governmental function into a proprietary function."); *City of Houston v. Petroleum Traders Corp.*, 261 S.W.3d 350, 356 (Tex. App.—Houston [14th Dist.] 2008, no pet.) ("Courts repeatedly have recognized that governmental functions encompass activities that are closely related to or necessary for performance of the governmental activities designated by statute."); *City of Galveston*, 217 S.W.3d at 469 (discussing the "heavy presumption in favor of immunity").

11

Accordingly, biosolids operations (like Fort Worth's at issue here) are governmental in nature and entitled to governmental immunity. *See Rogers*, 627 S.W.3d at 795.

III. **The *Wasson* factors do not apply in tort cases or where the Texas Legislature has enumerated a function as governmental in Tex. Civ. Prac. & Rem. Code § 101.0215.**

Plaintiffs rely heavily on the Texas Supreme Court case *Wasson Interests, Ltd. v. City of Jacksonville*, 559 S.W.3d 142 (Tex. 2018) to argue biosolids operations are not entitled to governmental immunity. Doc. No. 49 at 13–15; Doc No. 50 at 13–15. That reliance is misplaced.

*Wasson* was a breach-of-contract case centering on a city's leasing of lakefront property. 559 S.W.3d at 150. There, "[b]ecause the Tort Claims Act does not enumerate leasing property as a governmental or a proprietary function," the Texas Supreme Court determined that it needed to "apply the general definitions" for governmental and proprietary functions, with reference to a four-factor test. *Id.* The Court has since indicated that its opinion in *Wasson* is limited to breach-of-contract cases: "Our recent opinions in *Wasson Interests, Ltd. v. City of Jacksonville* . . . govern the analysis of whether municipal action challenged in a *breach-of-contract* case is proprietary or governmental." *Hays St. Bridge Restoration Grp. v. City of San Antonio*, 570 S.W.3d 697, 704 (Tex. 2019) (emphasis added). Plaintiffs' action sounds in tort, not contract. *Wasson* therefore does not govern the question of concern to Amici at issue in Defendants' motions seeking dismissal: whether political subdivisions' biosolids operations, including Fort Worth's, are protected by governmental immunity.

To the extent *Hays Street Bridge* leaves any ambiguity about where *Wasson* applies, Texas appellate courts have recently questioned its applicability outside of the breach-of-contract context or when the Texas Legislature has already enumerated a function as governmental in Tex. Civ. Prac. & Rem. Code § 101.0215. *See Doe v. City of Fort Worth*, 646 S.W.3d 889, 899 (Tex. App.— Fort Worth 2022, no pet.) ("*Wasson* was a breach of contract case. This is not."); *Del Rio*, 706

12

S.W.3d at 711 (concluding *Wasson* is not "applicable in tort cases" or where governmental function in question is enumerated); *Town of Highland Park v. McCullers*, 646 S.W.3d 578, 593 n.21 (Tex. App.—Dallas 2025, no pet.) (finding that consideration of *Wasson* factors was foreclosed by conclusion that town was engaged in police protection, an enumerated governmental function). These decisions are "the strongest indicator of what the [Texas Supreme Court] would do," and thus whether this Court should apply *Wasson*. *Hux v. S. Methodist Univ.*, 819 F.3d 776, 780–81 (5th Cir. 2016) ("Typically, we treat state intermediate courts' decisions as the strongest indicator of what a state supreme court would do, absent a compelling reason to believe that the state supreme court would reject the lower courts' reasoning.").

Because this is a tort case and biosolids operations are within the scope of enumerated governmental functions (*see supra* Part II), Amici submit that biosolids operations such as Fort Worth's are not subject to the four-factor test in *Wasson* and are entitled to governmental immunity.

## CONCLUSION

For the foregoing reasons, Amici respectfully request that, in evaluating Defendants' Motions to Dismiss, this Court hold that political subdivisions' biosolids operations are entitled to governmental immunity, in accordance with the intent of the Texas Legislature. Amici take no position on Defendants' or Plaintiffs' remaining arguments.

Dated: July 10, 2025

Respectfully submitted,

MARTEN LAW, LLP

*/s/ Jessica K. Ferrell*
Jessica K. Ferrell
TX Bar No. 24146520
*LR 83.7 Admission and LR 83.9 Pro Hac*

13

*Vice Applications Pending*
Marten Law, LLP
920 Fifth Ave. Suite 2700
Seattle, WA 98104
Email: jferrell@martenlaw.com
Telephone: (206) 292-2600
Fax: (206) 237-6069

*Attorney for the City of Fort Worth and*
*Trinity River Authority*

CITY OF FORT WORTH

/s/ *Chris Mosley*
Chris Mosley
TX Bar No. 00789505
Senior Assistant City Attorney
Section Chief, General Litigation
City of Fort Worth
100 Fort Worth Trail
Fort Worth, Texas 76102
Email: Chris.Mosley@fortworthtexas.gov
Telephone: (817) 392-7603
Fax: (817) 392-8359

*Attorney for the City of Fort Worth*
*LR 83.10 Local Counsel*

TRINITY RIVER AUTHORITY

/s/ *Alexis Long*
Alexis Long
TX Bar No. 24120401
General Counsel
Trinity River Authority of Texas
5300 S. Collins
Arlington, TX 76018
Email: longas@trinityra.org
Telephone: (817) 467-4343
Fax: (817) 465-0970

*Attorney for the Trinity River Authority*

14

CITY OF AUSTIN

*/s/ Ross Crow*
Ross Crow
TX Bar No. 05159000
Assistant City Attorney
City of Austin
301 W 2nd St # 1088
Austin, TX 78701-4652
Email: Ross.crow@austintexas.gov
Telephone: (512) 974-2159
Fax: (512) 974-6490

*Attorney for the City of Austin*

15

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was filed with this Court's CM/ECF system and was thus served electronically upon all registered counsel of record.

Dated: July 10, 2025

<div style="margin-left:45%;">

_Jessica K. Ferrell_
Jessica K. Ferrell,
TX Bar No. 24146520 *LR 83.7*
*Admission and LR 83.9 Pro Hac*
*Vice Applications Pending*
Marten Law, LLP
920 Fifth Ave, Suite 2700
Seattle, WA 98104
Email: jferrell@martenlaw.com
Telephone: (206) 292-2600
Fax: (206) 237-6069

*Attorney for the City of Fort Worth and*
*Trinity River Authority*

</div>